412 F.3d 553
 Gloria WILLINGHAM, Plaintiff-Appellant, and
Carl Jackson, Plaintiff,
v.
Douglas A. CROOKE, Sergeant, Defendant-Appellee, and
Graham Buck, Officer; Sherry A. Bassett, Officer; Officer Brian; J. Thomas Manger, Chief of Police, County of Fairfax; Fairfax County Board of Supervisors; County of Fairfax; Anthony Griffin, County Executive, Defendants.
 No. 04-1548.
 United States Court of Appeals, Fourth Circuit.
 Argued May 25, 2005.
 Decided June 23, 2005.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Paul Anthony Gowder, Jr., Victor M. Glasberg & Associates, Alexandria, Virginia, for Appellant. Robert Marvel Ross, County Attorney's Office for the County of Fairfax, Fairfax, Virginia, for Appellee. ON BRIEF: Victor M. Glasberg, Alexandria, Virginia, for Appellant. David P. Bobzien, County Attorney, Peter D. Andreoli, Jr., Deputy County Attorney, Fairfax, Virginia, for Appellee.
 Before WILKINS, Chief Judge, and TRAXLER and KING, Circuit Judges.
 Vacated and remanded by published opinion. Chief Judge WILKINS wrote the opinion, in which Judge TRAXLER and Judge KING joined.
 OPINION
 WILLIAM W. WILKINS, Chief Judge.
 
 
 1
 Gloria Willingham brought this action pursuant to 42 U.S.C.A. § 1983 (West 2003), alleging that she was arrested without probable cause, in violation of the Fourth Amendment, by Appellee Douglas A. Crooke, a sergeant with the Fairfax County, Virginia police department.[1] She appeals an order of the district court denying her motion for judgment notwithstanding the verdict or a new trial on damages, primarily maintaining that the district court erred in submitting the question of qualified immunity to the jury. She also challenges an evidentiary ruling of the district court. We conclude that the district court erred in instructing the jury on the legal question of whether, on the facts found by the jury, Sergeant Crooke was entitled to qualified immunity. Because this error was not harmless, we vacate the judgment and remand for a new trial. For the purpose of giving guidance to the district court, we also address the disputed evidentiary ruling.
 
 I.
 
 2
 The parties agree that Willingham was arrested for obstruction of justice, see Va. Code Ann. § 18.2-460(A) (LexisNexis 2004), during the early morning hours of December 12, 1998. Beyond this, however, the facts are sharply disputed. We will set forth the facts in a manner consistent with the verdict, noting Willingham's differing version of events where pertinent to the issues before us.
 
 
 3
 Willingham and Carl Jackson Sr. (Jackson) arrived at Jackson's home shortly after midnight on December 12. At the home was Lelia Jackson (Lelia), the girl-friend of Jackson's son, Carl Jackson Jr. (Jackson Jr.). Lelia informed Jackson that she had contacted the police for assistance with a dispute with Jackson Jr. Jackson resolved the dispute, told Lelia to go home, and stated that he would inform the police that the situation had been resolved.
 
 
 4
 Shortly thereafter, Officers Sherry Bassett,[2] Brian Buckholtz, and Graham Buck arrived at the scene. Jackson would not allow the officers to enter the house. The officers informed Jackson that department policy required them to enter the residence to be sure that Lelia was safe. Jackson falsely told the officers that Lelia had had an argument with someone named "Eric" and that both had left the residence. When the officers repeated that they needed to enter the home to assure themselves of Lelia's safety, Jackson again refused.
 
 
 5
 The officers again explained to Jackson that they could not simply take his word about Lelia's safety. Jackson then informed the officers that his guest could confirm the story about Eric. The officers agreed to let Jackson bring his guest to the door, but asked him not to talk to her and to leave the door open while he went into the house to get her. Jackson went inside and called for Willingham. Officer Buck observed Jackson talking to Willingham and asked him to stop. He then asked Willingham what was going on, and she replied "I'm sorry, I can't tell you anything until Carl tells me what's going on." J.A. 389 (internal quotation marks omitted). Jackson then came back to the door.
 
 
 6
 At this point, the officers asked Jackson if there was any way to contact Lelia. Jackson stated that he had her telephone number, and he agreed to leave the door open while he retrieved it. While Jackson was getting his address book, Willingham came to the door and attempted to close it. Officer Buck explained that Jackson had agreed to leave the door open, but Willingham nevertheless attempted to close it. Officer Buck placed his foot in the doorway to stop her from doing so. Willingham then stated, "Sir, I'm a lawyer. I respect the law, but you need to allow me to close this door." Id. at 390 (internal quotation marks omitted). Officer Buck refused this request, at which time Willingham asked for his name and badge number.[3]
 
 
 7
 When Jackson returned to the front door, Willingham went back into the house. Officer Bassett telephoned Lelia, who told Officer Bassett that she thought there were outstanding warrants for the arrest of Jackson Jr. Officer Bassett confirmed that three such warrants were pending. Each warrant, and records at the Department of Motor Vehicles, listed Jackson's address as the residence of Jackson Jr. When the officers approached Jackson with this information, however, Jackson denied that Jackson Jr. lived there. At this point, Officer Bassett called for a supervisor, and Sergeant Crooke arrived shortly thereafter. Sergeant Crooke informed Jackson, who had come outside, that the officers intended to enter the house to arrest Jackson Jr. and began walking toward the door. Jackson followed Sergeant Crooke to the door and attempted to stop him from opening it by grabbing the officer's arm. Sergeant Crooke pushed Jackson away and directed Officer Buck to arrest Jackson for obstruction of justice.
 
 
 8
 According to the officers, Willingham's arrest occurred as follows. Sergeant Crooke, followed closely by Officer Bassett, entered the residence. They did not have their guns drawn at this time. They encountered Willingham, who immediately began to ask the officers why they were in the home. She was "[v]ery animated, exaggerated, all theatrical, excited" as she began to walk toward the officers. Id. at 240. When she was within two feet of Sergeant Crooke, he informed her that they had entered the house to arrest Jackson Jr. and that she should sit down. Willingham briefly sat down, but then rose and stood in front of Sergeant Crooke as he tried to proceed. Sergeant Crooke again asked Willingham to sit down, warning her that she was in danger of being arrested for obstruction of justice. Willingham stepped aside. However, by the time Sergeant Crooke had taken two or three more steps, Willingham was in front of him again. At this point, Sergeant Crooke arrested her.
 
 
 9
 Willingham's account of her arrest differs substantially from that of the officers. According to Willingham, Sergeant Crooke entered the residence behind Officer Bassett, using his fellow officer as a shield. Sergeant Crooke had his firearm pointed at Willingham's head and kept it there despite Willingham's pleas for him not to point the weapon at her. Willingham asked Sergeant Crooke if he had a warrant, and he replied, "No, not yet." Id. at 116 (internal quotation marks omitted). Sergeant Crooke then shouted, "Come and get her," id., at which point an officer (presumably Officer Buck) entered the residence and placed Willingham in handcuffs.
 
 
 10
 Willingham was subsequently tried for obstruction of justice and acquitted. She thereafter filed this action, asserting various state and federal claims, including the Fourth Amendment claim at issue in this appeal.[4] Prior to trial, the district court granted summary judgment to Sergeant Crooke on the Fourth Amendment claim, concluding that he was entitled to qualified immunity.[5] This court reversed, holding that "[t]he evidence reveals a genuine issue of material fact as to whether Willingham obstructed Crooke and Bassett from searching the house for [Jackson Jr.]." Willingham v. Crooke, 40 Fed.Appx. 850, 852 (4th Cir.2002) (per curiam).
 
 
 11
 On remand, the case was tried before a jury. Over Willingham's objection, the district court gave the jury the following instruction regarding qualified immunity:
 
 
 12
 If you find that Ms. Willingham has proven her constitutional claim of being arrested without probable cause, you must then consider the defense of [Sergeant] Crooke that his conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident ... and that he is therefore not liable. This is known as the defense of qualified immunity.
 
 
 13
 Police officers are presumed to know about the clearly established constitutional rights of citizens. In this case, Ms. Willingham's constitutional right not to be arrested without probable cause was a clearly established right.
 
 
 14
 If after considering the scope of discretion and responsibility generally given to police officers in the performance of their duties and after considering all of the surrounding circumstances of the case as they would have reasonably appeared at the time of the arrest you find from a preponderance of the evidence that Ms. Willingham has proved that [Sergeant] Crooke knowingly violated the law regarding Ms. Willingham's constitutional rights, you must find for Ms. Willingham.
 
 
 15
 If, however, you find that [Sergeant] Crooke had a reasonable belief that his action did not violate the constitutional rights of Ms. Willingham, then you cannot find [Sergeant] Crooke liable even if Ms. Willingham's rights were, in fact, violated as a result of his objectively reasonable action.
 
 
 16
 Tr. Trans., Vol. III, at 607-08. The jury returned a verdict in favor of Sergeant Crooke.
 
 II.
 
 17
 Willingham first maintains that the district court erred in submitting the question of qualified immunity to the jury. Her argument is twofold. First, she maintains that this court resolved the question of qualified immunity during the prior appeal. Second, she asserts that even if the issue was not conclusively decided, the question should have been decided by the district court rather than by the jury.[6]
 
 A.
 
 18
 Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).
 
 
 19
 Assertion by a defendant of qualified immunity requires consideration of two questions. The first is "whether a constitutional right would have been violated on the facts alleged" by the plaintiff. Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the question then becomes whether the right asserted was clearly established at the time of the alleged violation. See id. In answering this latter question, the relevant inquiry is whether "it would be clear to an objectively reasonable officer that his conduct violated [the] right." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir.2002).
 
 
 20
 Ordinarily, the question of qualified immunity should be decided at the summary judgment stage. See Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir.2003); accord Saucier, 533 U.S. at 200, 121 S.Ct. 2151 ("Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." (internal quotation marks omitted)). Qualified immunity does not, however, override the ordinary rules applicable to summary judgment proceedings. See Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir.1992). Thus, while the purely legal question of whether the constitutional right at issue was clearly established "is always capable of decision at the summary judgment stage," a genuine question of material fact regarding "[w]hether the conduct allegedly violative of the right actually occurred ... must be reserved for trial." Id.
 
 B.
 
 21
 We reject Willingham's contention that our prior decision—holding that Sergeant Crooke was not entitled to summary judgment on the basis of qualified immunity— finally disposed of the qualified immunity defense because the evidence presented at trial was essentially the same as the evidence forecasted in the summary judgment record. Because the prior appeal concerned Willingham's challenge to the grant of summary judgment to Sergeant Crooke, we were required to view the evidence in the light most favorable to her. See Willingham, 40 Fed.Appx. at 851. And, in affirming the denial of summary judgment we decided only that the forecasted evidence, when viewed in the light most favorable to Willingham, established a violation of clearly established law. See id. at 852. The jury, however, was not required to view the facts in the light most favorable to Willingham, and thus could reasonably have found in favor of Willingham with respect to some facts but not others. Because we did not decide what a reasonable officer would have known regarding the lawfulness of his actions under any other version of events, the qualified immunity defense remained viable after our decision.
 
 C.
 
 22
 Although we reject Willingham's first contention, we agree with her second. The question of whether Sergeant Crooke was entitled to qualified immunity under the facts found by the jury—i.e., whether a reasonable officer would have known that his actions violated the law—should not have been submitted to the jury.
 
 
 23
 There is no question that when the historical facts are undisputed, whether a reasonable officer should have known of the illegality of his conduct is a question of law for the court. See, e.g., Wadkins v. Arnold, 214 F.3d 535, 538 n. 4 (4th Cir. 2000). The existence of disputed material facts—which must be submitted to a jury, see Pritchett, 973 F.2d at 313—does not alter the "essentially legal" nature of the question of whether the right at issue was clearly established. Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Indeed, we indicated in Knussman v. Maryland, 272 F.3d 625, 634 (4th Cir.2001), that this legal question should not be submitted to the jury. There, the district court submitted to the jury both disputed factual issues and the ultimate question of whether the defendant was entitled to qualified immunity on the basis that he could reasonably have believed that his actions were lawful. Although the defendant did not challenge the submission of that question to the jury, we noted our disapproval of the practice:
 
 
 24
 [A]lthough the jury may be suited for making factual findings relevant to the question of qualified immunity, we believe it is far better for the court, not the jury, to answer the ultimate legal question of whether a defendant is entitled to qualified immunity. The nature of the analysis—requiring an examination of current federal law and federal law as it existed at the time of the alleged violation —makes for an awkward determination by the jury, at best. But, since the issue has not been raised, we will leave for another day the question of whether it is ever appropriate for a jury to answer the ultimate legal question of a defendant's entitlement to qualified immunity.
 
 
 25
 Knussman, 272 F.3d at 634 (citation omitted).
 
 
 26
 The issue having now come before us, we hold that the legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by the jury. See Littrell v. Franklin, 388 F.3d 578, 584-86 (8th Cir.2004); Swain v. Spinney, 117 F.3d 1, 9-10 & n. 3 (1st Cir.1997); Cottrell v. Caldwell, 85 F.3d 1480, 1487-88 (11th Cir.1996); Warlick v. Cross, 969 F.2d 303, 305 (7th Cir.1992). But see Oliveira v. Mayer, 23 F.3d 642, 649-50 (2d Cir.1994) (holding that the district court erred in failing to submit the question of reasonableness to the jury); but cf. Curley v. Klem, 298 F.3d 271, 278-79 (3d Cir.2002) (holding that once disputed factual questions are resolved, the question of the reasonableness of an officer's actions may be decided either by the jury or by the court); but cf. also Maestas v. Lujan, 351 F.3d 1001, 1008-10 (10th Cir.2003) (holding that the jury may decide the question of reasonableness if disputed facts are dispositive of that question); Fisher v. City of Memphis, 234 F.3d 312, 317 (6th Cir.2000) (similar); Snyder v. Trepagnier, 142 F.3d 791, 799-800 (5th Cir.1998) (similar), cert. granted, 525 U.S. 1098, 119 S.Ct. 863, 142 L.Ed.2d 716 (1999), cert. dismissed, 526 U.S. 1083, 119 S.Ct. 1493, 143 L.Ed.2d 575 (1999).
 
 
 27
 As we explained in Knussman, juries are ill-suited to make the determinations of law required by the qualified immunity analysis. See Knussman, 272 F.3d at 634. Therefore, to the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.
 
 
 28
 Having concluded that the district court erred in instructing the jury on qualified immunity, we next consider whether the error was harmless.[7] We will not set aside a jury verdict based on an instructional error "unless the erroneous instruction seriously prejudiced the challenging party's case." College Loan Corp. v. SLM Corp., 396 F.3d 588, 595 (4th Cir. 2005) (internal quotation marks omitted). In assessing prejudice, we must avoid making our own credibility determinations. See Webber v. Sobba, 322 F.3d 1032, 1038 (8th Cir.2003) (holding that erroneous jury instruction was not harmless, in part because the outcome depended "largely on credibility determinations that are for the trial jury to make"); accord United States v. Lowe, 65 F.3d 1137, 1142 (4th Cir.1995) ("Credibility determinations are within the sole province of the jury....").
 
 
 29
 We cannot say that the error of instructing the jury on qualified immunity was harmless. In order to render a verdict, the jury was required to assess the credibility of the witnesses and reach conclusions as to the historical facts, given the witnesses' various stories. The testimony of the witnesses was in accord with respect to some events, and utterly inconsistent with respect to others. Under these circumstances, we cannot conclude with any certainty that the verdict rested on the determination of the jury that there was probable cause for Willingham's arrest, rather than on a determination that probable cause was lacking (thus creating a constitutional violation) but that Sergeant Crooke could have reasonably believed otherwise (and thus was entitled to qualified immunity). See Webber, 322 F.3d at 1038 (holding that an erroneous jury instruction was not harmless because the reviewing court had "no way of knowing that the general verdict ... was not a product of the improper ... instruction"). Therefore, we vacate the judgment and remand for a new trial.
 
 III.
 
 30
 Willingham also contends that the district court erred in refusing to admit notes taken by her treating physicians following her arrest. In light of our remand on the qualified immunity issue, we will address this issue in order to provide guidance to the district court. We conclude that the district court should not have excluded the notes.
 
 
 31
 Willingham sought medical treatment on December 12, following her release from detention. Doctor Olympia Dallas' notes reveal that Willingham complained of anxiety and of pain in her wrist, shoulder, and back stemming from the incidents surrounding her arrest. Dr. Dallas' notes also contain Willingham's account of events from the time the police arrived at Jackson's home until her release from detention, including the statement that she "was told by officer pointing a gun at her to sit down." J.A. 54. On December 14, Willingham had a follow-up visit with Dr. Foster Montalbano for "trauma that she sustained in an altercation with police." Id. at 56. Doctor Montalbano recorded that Willingham was suffering from pain and emotional trauma—including nightmares and difficulty sleeping—stemming from her arrest. The physician's notes also contain the following pertinent statements regarding the source of Willingham's injuries:
 
 
 32
 [Willingham] alleges that she was at [a] friend's house when police came to the door. She was assisting her friend when she was arrested for obstruction of justice. She was handcuffed with her hands behind her and placed in a cold squad car with inadequate ventilation. She was intimidated with a gun pointed at her face and then not provided with adequate clothing as she was transported to the police station.
 
 
 33
 
 Id.
 
 
 
 34
 The district court excluded both sets of physicians' notes on the basis that Willingham's "statements regarding the gun were not sufficiently related to treatment of her physical injuries." J.A. 47. We conclude that this ruling was an abuse of discretion. See United States v. Leftenant, 341 F.3d 338, 342 (4th Cir.2003) (stating standard of review), cert. denied, 540 U.S. 1166, 124 S.Ct. 1183, 157 L.Ed.2d 1215 (2004).
 
 
 35
 Rule 803(4) of the Federal Rules of Evidence allows the admission of hearsay statements "made for purposes of medical diagnosis or treatment and describing... present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." This exception to the hearsay rule is premised on the notion that a declarant seeking treatment "has a selfish motive to be truthful" because "the effectiveness of medical treatment depends upon the accuracy of the information provided." 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.06[1] (Joseph M. McLaughlin, ed., 2d ed.2004); see Morgan v. Foretich, 846 F.2d 941, 949 (4th Cir.1988). Admissibility of a statement pursuant to Rule 803(4) is governed by a two-part test: "(1) the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and, (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." Morgan, 846 F.2d at 949 (internal quotation marks & footnote omitted). With respect to the second prong, we note that "[i]n general, a patient's statement describing how an injury occurred is pertinent to a physician's diagnosis and treatment." United States v. Gabe, 237 F.3d 954, 957-58 (8th Cir.2001).
 
 
 36
 Contrary to the district court, we believe that most of Willingham's statements to her doctors "related ... to the cause of her present condition, [and] were relevant in diagnosing that condition." United States v. Iron Thunder, 714 F.2d 765, 773 (8th Cir.1983). While the district court was correct that Willingham's statements about a firearm being pointed at her were not relevant to her physical injuries, it is clear from the physicians' notes that Willingham was also seeking treatment for emotional trauma. Willingham's statements to her doctors indicate that her emotional trauma stemmed, in part, from having a firearm pointed at her; therefore, these statements were relevant to her diagnosis and treatment.
 
 
 37
 We do not believe, however, that Willingham is entitled to the admission of the entirety of her statement as recorded by Dr. Dallas. In particular, we conclude as a matter of law that the first portion of Willingham's statement—in which she relates events between her arrival at Jackson's home and her use of the upstairs bathroom just before the officers' entry into the home—was not relevant to the diagnosis and treatment of any injury suffered by Willingham. The remainder of her statements to Drs. Dallas and Montalbano, however, are admissible under Rule 803(4) to the extent they are relevant to the issues presented at trial.
 
 IV.
 
 38
 For the reasons set forth above, we vacate the judgment and remand for a new trial.
 
 
 VACATED AND REMANDED
 
 
 
 Notes:
 
 
 [1]
 Sergeant Crooke has since been promoted to the rank of Lieutenant
 
 
 [2]
 After the events described herein, Officer Bassett married and took the surname Cooke. Consistent with the practice of the parties and the district court, we refer to Officer Bassett by her name at the time of the arrest
 
 
 [3]
 Willingham denied ever attempting to close the door, and she testified that Officer Buck was rude and made a "snide remark" about her request to close the doorId. at 106. She did not testify regarding whether she had asked for Officer Buck's name and badge number.
 
 
 [4]
 Jackson was also a plaintiff in the action, but he is no longer a party to the litigation. Willingham named as defendants the other officers present at the scene, the chief of police, the Fairfax County Board of Supervisors, Fairfax County, and the county executive. Only Sergeant Crooke is still involved in this litigation
 
 
 [5]
 Indeed, the district court granted summary judgment to all defendants on all counts, with the exception of Willingham's claim against Officer Buck for excessive force. This claim proceeded to trial during the pendency of Willingham's appeal of the qualified immunity ruling, and the jury found in favor of Officer Buck
 
 
 [6]
 Willingham also contends that the district court should have given the jury Willingham's proposed interrogatories, the first of which asked the jury whether it found "that Sergeant Crooke pointed a gun at Gloria Willingham upon entering Carl Jackson's house[.]" J.A. 58. We agree with the district court that this question was irrelevant to the issue of whether Sergeant Crooke had probable cause to arrest Willingham for obstruction of justice
 
 
 [7]
 The district court stated that any error in giving the qualified immunity instruction was harmless because even if the jury had returned a verdict in favor of Willingham, the court would have granted judgment as a matter of law to Sergeant Crooke. This conclusion of the district court appears to have been based largely on its conclusion that Willingham was not a credible witness. However, the court is not permitted to consider witnesses' credibility in ruling on a motion for judgment as a matter of lawSee Randall v. Prince George's County, 302 F.3d 188, 201 (4th Cir.2002).