**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SHIRLEY GREGG,

*Plaintiff-Appellee,*

v.

JON E. HAM; QUICK SILVER BAIL
BONDS LLC,

*Defendants-Appellants,*

and

SUMTER COUNTY SHERIFF'S
DEPARTMENT; SENIOR DEPUTY JUSTIN
YELTON,

*Defendants.*

No. 10-1738

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge.
(3:08-cv-04040-CMC)

Argued: January 26, 2012

Decided: April 30, 2012

Before NIEMEYER, MOTZ, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion,
in which Judge Niemeyer and Judge Motz joined.

**COUNSEL**

**ARGUED:** Adam Tremaine Silvernail, LAW OFFICE OF ADAM T. SILVERNAIL, LLC, Columbia, South Carolina, for Appellants. William Elvin Hopkins, Jr., BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC, Montgomery, Alabama, for Appellee. **ON BRIEF:** James T. McBratney, III, MCBRATNEY LAW FIRM, PA, Florence, South Carolina, for Appellants. Paul M. Fata, STUCKEY, FATA & SEGARS, LLC, Bishopville, South Carolina, for Appellee.

---

**OPINION**

DIAZ, Circuit Judge:

Shirley Gregg sued bail bondsman Jon Ham and others alleging civil rights violations under 42 U.S.C. § 1983, as well as various state law tort claims. The claims stem from Ham's efforts to apprehend a fugitive in and around Gregg's home. A jury found in Gregg's favor on her § 1983, trespass, and assault claims—awarding a total of $100,000 in compensatory and punitive damages. Ham appealed, challenging the jury's verdict and damages award.

Among the issues Ham raises is a challenge to the court's jury instruction on qualified immunity. As part of his defense, Ham asserted that he was entitled to qualified immunity from the § 1983 claim. Ham now contends for the first time on appeal that the district court erred by submitting the legal issue of qualified immunity to the jury. Reviewing for plain error, we find Ham's argument unpersuasive. There was no error—plain or otherwise—because as a bail bondsman Ham was not entitled to qualified immunity. Finding no merit in any of Ham's other claims, we affirm.

# I.

## A.

Jon Ham, through his company Quick Silver Bail Bonds LLC, posted a $20,000 bond for Tyis Rose following his arrest for assault with intent to kill in Florence County, South Carolina. After Rose failed to appear, the court issued a fugitive warrant for Rose's arrest. Ham concentrated his search for Rose in Sumter County, South Carolina in the community where Rose's parents lived. Shirley Gregg lived in the same community, approximately a mile and a half from Rose's parents. Gregg was acquainted with Rose's family but did not know them well. Gregg suffered from several physical ailments—including rheumatoid arthritis and the effects of several joint replacements—that prevented her from working and left her largely confined to her home.

After months of searching for Rose, Ham observed someone driving a white car that he suspected belonged to Rose. Ham pursued the vehicle, and a chase ensued. The car, which was in fact driven by Rose, ultimately came to rest on Gregg's property. At that point, Rose fled the vehicle and began running from Ham. Rose took several steps toward Gregg's house before running into a nearby wooded area. Ham gave chase on foot and fired several shotgun blasts over Rose's head. Despite his efforts, Ham failed to apprehend Rose.

Ham purportedly conducted surveillance from the woods at the edge of Gregg's property later that evening and saw Rose enter Gregg's house. Two days later, Ham returned to Gregg's property at 7:30 a.m. along with Sumter County Sheriff's Deputy Justin Yelton and several other bail bondsmen. Ham called the Sheriff's Department for assistance "to make sure there were no problems," J.A. 178, but did not ask the sheriff to obtain a search warrant—nor was one ever issued. According to Yelton, Ham was in charge during the visit to Gregg's house and did most of the talking.

Ham and Yelton stepped onto Gregg's porch, while the other bail bondsmen surrounded the house. The pair knocked on Gregg's door and requested entry to search for Rose. Gregg, who was in bed when she heard the knock, responded through the door that there was no one else inside. Gregg testified that Ham was "shaking the door like he was going to break it" and warned her that she "had to let them come in or he was going to come in." *Id.* 79–80. Through the window, Gregg observed that Ham was armed with a shotgun but was unable to see Yelton until she opened the door. Gregg ultimately allowed Ham and Yelton to enter because she felt threatened and "wasn't going to try to get killed." *Id.* 80. According to Ham and Yelton, Gregg verbally consented several times to the search both prior to and after their entry. Gregg observed that upon entering the house, Ham aimed his shotgun head-high or at chest level and kept it pointed up while searching throughout the house. Unable to locate Rose, Ham became agitated and started yelling questions at Gregg about Rose's whereabouts. After Gregg began crying, Yelton intervened and asked Ham to leave her alone.

Following Ham and Yelton's departure, Gregg called 911 to complain about the entry and search. Yelton, who was still in the area, responded to the call. Gregg indicated that she did not wish to speak to Yelton but instead asked to speak to his supervisor. Later that day, Gregg's brother warned Ham not to return to his sister's house. Despite the warning, Ham returned to tell Gregg that he had raised the reward for Rose's apprehension. In response, Gregg called her sister, who confronted Ham and told him to leave. According to Gregg, Ham responded that "he can do whatever he wanted to do." *Id.* 93.

As a result of her encounters with Ham, Gregg was scared to stay by herself, began locking her doors, felt anxious and insecure, and had trouble sleeping. Gregg ultimately sought counseling from a psychologist, who concluded that Gregg suffered from depression and anxiety and diagnosed her with post-traumatic stress disorder. The psychologist also noted

that Gregg's preexisting disabilities exacerbated the impact of the incident, causing her to feel more threatened.

B.

Gregg sued Ham, Quick Silver, the Sumter County Sheriff's Department, and Yelton in the Court of Common Pleas in Sumter County, South Carolina. She alleged causes of action for (1) gross negligence and recklessness, (2) constitutional violations of the Fourth and Fourteenth Amendments under § 1983, (3) trespass, (4) intentional infliction of emotional distress, and (5) assault. Based on the issue of federal law presented in Gregg's § 1983 claim, the defendants removed the case to federal court. Gregg subsequently settled her claims against the Sheriff's Department and Yelton.

The claims against Ham and Quick Silver were tried before a jury. The district court granted the defendants' motion for a directed verdict on the intentional infliction of emotional distress claim. The jury returned a verdict for Gregg, awarding nominal damages on Gregg's § 1983 and trespass claims and $50,000 in compensatory damages on her assault claim. The jury also awarded a total of $50,000 in punitive damages, including $30,000 on the § 1983 claim and $10,000 each on the trespass and assault claims.

Ham filed a motion under Rules 50 and 59 of the Federal Rules of Civil Procedure, seeking a judgment notwithstanding the verdict, a new trial, and alteration or amendment of the judgment. The district court denied Ham's motion. On appeal, Ham contends that (1) the district court erred by submitting the issue of qualified immunity to the jury, (2) he is entitled to judgment as a matter of law on the § 1983 and assault claims, and (3) the damages awards on the various claims were inconsistent, unsupported by the facts, and excessive. We consider each claim in turn.

## II.

Ham contends that he is entitled to a new trial on the § 1983 claim because the district court improperly submitted the legal question of qualified immunity to the jury. Because Ham did not object to the jury instruction at trial, we review for plain error. *See* Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved . . . if the error affects substantial rights."). Applying plain error review, we will not reverse unless Ham can establish: "(1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the court determines . . . that the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *In re Celotex Corp.*, 124 F.3d 619, 630–31 (4th Cir. 1997) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). Ham is unable to show that the district court committed plain error.

The defense of qualified immunity involves a two-step procedure "that asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010)). In determining whether a right is clearly established, courts consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 534 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Qualified immunity is typically an immunity from suit, rather than a mere defense to liability, and is effectively lost if a case is permitted to go to trial. *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 275 (4th Cir. 2011). Nevertheless, in *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005), we explained that if "a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury."

In *Willingham*, the district court committed reversible error when it instructed the jury to find whether a reasonable officer in the defendant's position would have known that his actions violated the law. *Id.* at 558.[1] Noting the "essentially legal nature of the question of whether the right at issue was clearly established," we held that "the legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by the jury." *Id.* at 559–60 (quotation omitted).

Here, the district court asked the jury, "Could defendant Jon E. Ham, based upon the totality of the circumstances, have reasonably believed that plaintiff had given him knowing and voluntary consent to search her home?" J.A. 327, 384.[2] Neither party objected to the court's instruction. Relying on the rule announced in *Willingham*, Ham now contends that the jury instruction constituted plain error because it required the jury to answer the legal question of qualified immunity. We need not resolve this issue, however, because even assuming the instruction was improper, there was no error because Ham was not entitled to a qualified immunity defense.

A private party may be liable under § 1983 if acting "under color of state law"[3] but is not necessarily entitled to assert a

---

[1] In *Willingham*, the district court instructed the jury in part that "[i]f . . . you find that [defendant] had a reasonable belief that his action did not violate the constitutional rights of [plaintiff], then you cannot find [him] liable even if [plaintiff's] rights were, in fact, violated as a result of his objectively reasonable action." 412 F.3d at 558.

[2] The jury concluded that Ham could not have reasonably believed Gregg knowingly and voluntarily consented to the search.

[3] A private party is considered a state actor for purposes of § 1983 if "the deprivation [is] caused by the exercise of some right or privilege created by the State . . . [and] the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The second part of this test is satisfied if the defendant "has acted together with or has obtained significant aid from state officials." *Id.* Applying these principles, we have held that a bail bondsman executing a search for a fugitive with the assistance of a police officer is a state actor and therefore subject to § 1983 liability. *See Jackson v. Pantazes*, 810 F.2d 426, 429–30 (4th Cir. 1987).

qualified immunity defense. Although § 1983 "creates a species of tort liability that on its face admits of no immunities," courts have recognized qualified immunity in cases in which "the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Wyatt v. Cole*, 504 U.S. 158, 163–64 (1992) (quotations omitted). Thus, when determining whether a private party acting under color of state law is entitled to qualified immunity, the Supreme Court has instructed courts "to look both to history and to the purposes that underlie government employee immunity." *Richardson v. McKnight*, 521 U.S. 399, 404 (1997). If "[h]istory does not reveal a firmly rooted tradition of immunity" and the policy considerations underlying qualified immunity do not apply to the category of private persons of which the defendant is a part, then he is not entitled to qualified immunity. *See id.* at 404, 407–08.[4]

Applying the test articulated in *Richardson*, we conclude that the history and policy behind the qualified immunity defense do not support extending it to bail bondsmen. First, there is no evidence that bail bondsmen have historically been afforded immunity for their actions. In fact, courts have rejected the notion that bail bondsmen act as an arm of the court or perform a public function. *See, e.g.*, *Ouzts v. Md. Nat'l Ins. Co.*, 505 F.2d 547, 554–55 (9th Cir. 1974) (rejecting the "strange thesis" that a bail bondsman is "an arm of the

---

[4]In *Filarsky v. Delia*, No. 10-1018, slip op. at 11 (U.S. Apr. 17, 2012), the Supreme Court recently held that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." In affording qualified immunity to an attorney hired by a local municipality to conduct an investigation, the Court considered "the 'general principles of tort immunities and defenses' applicable at common law, and the reasons [it has] afforded protection from suit under § 1983." *Id.* at 5. (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). The Court's decision, however, did nothing to disturb the test outlined in *Richardson* but instead, by looking to history and the purposes of § 1983, endorsed the analysis we apply here.

court"); *Fitzpatrick v. Williams*, 46 F.2d 40, 40 (5th Cir. 1931) ("The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bond.").

Second, the policy justifications underlying qualified immunity do not apply to bail bondsmen. *See generally Bailey v. Kenney*, 791 F. Supp. 1511, 1523–25 (D. Kan. 1992) (concluding that "[w]ith respect to bail bondsmen, the court finds none of the compelling policy reasons that traditionally justify the availability of qualified immunity to state actors performing discretionary functions").[5] Courts have traditionally afforded qualified immunity to public officials because susceptibility to suit would distract them from performing their public functions, inhibit discretionary action, and deter desirable candidates from performing public service. *See Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). There is no need, however, for qualified immunity to shield bondsmen from suit, as they are not entrusted with a public function. To the contrary, while the law certainly allows a bail bondsman to apprehend a fugitive, that right is exercised in tandem with the obligation of law enforcement to accomplish the same objective. *See Bailey*, 791 F. Supp. at 1524.

Moreover, rather than operating in the interest of public service, the work of a bail bondsman is fueled primarily by a strong profit motive. *See Richardson*, 521 U.S. at 409–10 (highlighting the importance of "ordinary marketplace pressures"). Accordingly, even if bail bondsmen are entrusted with a public function, the economic incentives inherent in the system would "ensure an ample number of qualified persons

---

[5]Although *Bailey* preceded *Wyatt* and *Richardson*, the court's analysis tracks the Supreme Court's later articulation of the standard for evaluating whether a private individual is entitled to qualified immunity. Specifically, the *Bailey* court examined whether the history and purpose of qualified immunity supports extending the defense to bail bondsmen. 791 F. Supp. at 1524.

willing to assume the occupational risks of apprehending fugitives." *Bailey*, 791 F. Supp. at 1524.

In sum, neither history nor policy support extending the qualified immunity defense to bail bondsmen.[6] Ham is therefore unable to show error, plain or otherwise, based on the district court's jury instruction on a defense to which he was not entitled.[7]

---

[6]The Court's recent decision in *Filarsky*—holding that immunity under § 1983 does not vary based on whether an individual works full-time for the government or does so on some other basis—does nothing to change the result in this case. *Filarsky*, slip op. at 11. As we have explained, Ham was a bail bondsman, not an "arm of the court," and thus operated in pursuit of his own financial self-interest. He was not employed by the Sheriff's Department and did not report to law enforcement. Moreover, the sheriff did not call on Ham to assist in its efforts to apprehend Rose; instead, it was Ham who called on Deputy Yelton to prevent—unsuccessfully it turns out—a breach of the peace at Gregg's home. Finally, as Yelton confirmed, Ham was in charge of the search and did not act at Yelton's direction. Because Ham was not hired by or working on behalf of the government in any capacity, *Filarsky* is inapposite and, for the reasons discussed, Ham is not entitled to qualified immunity.

[7]Even if Ham was entitled to assert a qualified immunity defense, any error in the contested instruction did not affect his substantial rights because he nevertheless fails to satisfy the requirements of the defense. To prevail under qualified immunity, Ham has to show either that there was no constitutional violation or that the right violated was not clearly established. *Henry*, 652 F.3d at 531. He can do neither. First, the jury concluded that Ham committed a constitutional violation when it found, in response to the district court's appropriate factual interrogatory, that Ham searched Gregg's home without her "knowing and voluntary consent." *Contra Willingham*, 412 F.3d at 561 (remanding where we were unable to determine based on the form of the verdict whether the jury's decision rested on the factual question of whether a constitutional violation occurred or on the separate legal question of whether the violation transgressed clearly established law). Second, Supreme Court precedent clearly establishes that an officer may not conduct a warrantless search of a home without consent under the circumstances presented here. *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional."). Accordingly, even if the court erroneously submitted the legal issue of qualified immunity to the jury, Ham cannot satisfy plain error review because he is unable to show that he would otherwise have been entitled to the defense.

### III.

Ham also appeals the denial of his Rule 50(b) motion for judgment as a matter of law on the § 1983 and assault claims. We review the denial of a Rule 50(b) motion de novo, viewing the evidence in the light most favorable to the prevailing party, and will affirm the denial of such a motion unless the jury lacked a legally sufficient evidentiary basis for its verdict. *First Union Comm'l Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005).

### A.

Ham contends that there was insufficient evidence supporting Gregg's § 1983 claim that, while acting under color of state law, Ham violated Gregg's constitutional rights by entering and searching her home. According to Ham, the undisputed evidence showed that Gregg consented to the search. We disagree.

"Valid consent is a well-recognized exception to the Fourth Amendment prohibition against warrantless searches." *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001). Consistent with our cases, the jury here was properly instructed to examine the totality of the circumstances to determine if Gregg's consent was knowing and voluntary. *Id.* As part of the totality of the circumstances analysis, the district court instructed the jury to look to the characteristics of the individual providing consent, as well as the conditions under which the consent to search was given. *See United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996).

Here, the evidence shows that Gregg, a physically disabled woman, was alone in her bed when Ham came to her door at 7:30 in the morning armed with a shotgun and accompanied by a sheriff's deputy and at least two other bail bondsmen. Gregg testified that Ham was "shaking the door like he was going to break it" and warned that she "had to let them come

in or he was going to come in." J.A. 79–80. Under these circumstances, there was sufficient evidence to support the jury's conclusion that Gregg's consent was involuntary. Accordingly, we affirm the verdict on the § 1983 claim.[8]

### B.

Ham next contends that he is entitled to judgment as a matter of law on the assault claim because no reasonable juror could conclude that Gregg was in reasonable fear of bodily harm. Viewing the evidence, as we must, in the light most favorable to Gregg, we reject Ham's contention.

Under South Carolina law, the elements of assault are "(1) conduct of the defendant which places the plaintiff, (2) in reasonable fear of bodily harm." *Mellen v. Lane*, 659 S.E.2d 236, 244 (S.C. Ct. App. 2008). The evidence shows that Ham arrived at Gregg's house early in the morning armed with a shotgun. According to Gregg's account of the incident, which the jury was entitled to credit, Ham shook the door, demanded entry, threatened Gregg, and then entered with his shotgun aimed head-high or at chest level. Based on these facts, there was a sufficient basis to support the jury's conclusion that Gregg was in reasonable fear of bodily harm.

### IV.

Ham also argues that the district court erred by denying his Rule 59 motion for a new trial or remittitur on damages. Ham asserts that the jury's damages awards on the § 1983 and assault claims were inconsistent, the actual damages awarded on the assault claim lacked support, and the punitive damages award was excessive. We review the denial of a motion for a

---

[8]Ham also contends that the evidence shows that he did not violate a clearly established constitutional right and therefore was entitled to qualified immunity as a matter of law. We reject this argument for the reasons we have discussed previously.

new trial under Rule 59 for abuse of discretion. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009). "A district court abuses its discretion by upholding an award of damages only when the jury's verdict is against the weight of the evidence or based on evidence which is false." *Id.* (quotations omitted).

A.

Ham moved for a new trial based on what he contends were inconsistent damages awards on the § 1983 claim and the assault claim. The jury awarded nominal damages for the constitutional violation underlying Gregg's § 1983 claim but awarded $50,000 in actual damages for the assault. According to Ham, the awards were inconsistent because both claims were based on the same conduct. The district court disagreed and denied Ham's motion for a new trial. We affirm.

Contrary to Ham's contention, the § 1983 and assault claims constituted separate violations. The § 1983 claim alleged an unconstitutional entry into Gregg's home, while the assault claim alleged that Ham placed Gregg in reasonable fear of bodily harm by, among other things, threatening her and pointing a shotgun in her direction. Because the claims relate to separate conduct, the jury could reasonably conclude that Ham committed both violations but that Gregg's actual damages stemmed only from the assault. Accordingly, the district court did not abuse its discretion by denying Ham's motion for a new trial under this theory.

B.

Ham also sought a remittitur of the $50,000 in actual damages awarded in conjunction with Gregg's assault claim. According to Ham, the evidence of Gregg's medical expenses did not justify the amount of the award. The district court rejected Ham's argument, concluding that there was more

than enough evidence to support the award. We find no abuse of discretion.

Gregg testified that the assault caused her to change her behavior, left her scared, and disrupted her sleep. Furthermore, Gregg's psychologist concluded that she suffered from depression and anxiety as a result of her encounter with Ham and diagnosed her with post-traumatic stress disorder, a condition that was exacerbated by her physical disabilities. Based on this testimony, we cannot say that the $50,000 damages award was "against the weight of the evidence or based on evidence which is false." *Id.* at 242. Accordingly, we affirm the district court's denial of Ham's motion regarding the actual damages award.

## C.

Finally, Ham claims that the district court abused its discretion by failing to reduce the jury's punitive damages award. The jury awarded a total of $50,000 in punitive damages: $30,000 on the § 1983 claim and $10,000 each on the assault and trespass claims. We again find no abuse of discretion.

"When there is no constitutional challenge to a jury's award of punitive damages, a federal district court reviews such an award by applying the state's substantive law of punitive damages." *King v. McMillan*, 594 F.3d 301, 312–13 (4th Cir. 2010) (quotation omitted). Under South Carolina law, to receive an award of punitive damages the plaintiff must show that the defendant's misconduct was "willful, wanton, or in reckless disregard of the plaintiff's rights." *Taylor v. Medenica*, 479 S.E.2d 35, 46 (S.C. 1996). A trial judge may only set aside an award if it is "so grossly excessive so as to shock the conscience of the court and clearly indicates that the figure reached was the result of caprice, passion, prejudice, partiality, corruption, or other improper motives." *Rush v. Blanchard*, 426 S.E.2d 802, 805 (S.C. 1993).

In denying Ham's request for a remittitur or new trial on punitive damages, the district court highlighted Gregg's testimony describing her encounter with Ham and concluded that "his actions were threatening, dangerous, and reprehensible." J.A. 439. The district court also found that the punitive damages award bore a reasonable relationship to the compensatory damages. Based on our review, we find no abuse of discretion in the district court's decision to leave the punitive damages award undisturbed.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*