**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 17-4344**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ISMAEL AZUA-RINCONADA,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Louise W. Flanagan, District Judge. (7:16-cr-00005-FL-1)

Argued: September 28, 2018                Decided: January 28, 2019

Before NIEMEYER and KEENAN, Circuit Judges, and Norman K. MOON, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Keenan and Judge Moon joined. Judge Keenan wrote a separate opinion, concurring.

**ARGUED:** Anne Margaret Hayes, Cary, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Robert J. Higdon, Jr., United States Attorney, Jennifer, P. May-Parker, Acting First Assistant United States Attorney, Phillip A. Rubin, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

After Ismael Azua-Rinconada ("Azua") was indicted for illegally entering the United States in violation of 8 U.S.C. § 1326(a), he filed two motions to suppress all statements and all other evidence obtained by law enforcement officers during their encounter with him prior to his arrest. He alleged that the officers, acting without a warrant, gained access to his residence through coercion, in violation of the Fourth Amendment, and that they then subjected him to custodial interrogation without providing him with *Miranda* warnings, in violation of the Fifth Amendment. Following a hearing, the district court denied the motions, concluding that the officers received voluntary consent to enter Azua's residence and that Azua was not in custody when he voluntarily gave answers to the officers' questions. A jury then found Azua guilty of violating § 1326(a), and the court sentenced him to time served and committed him to the custody of the Department of Homeland Security for deportation.

On appeal, Azua contends that the district court erred in denying his suppression motions because (1) the law enforcement officers did not have valid consent to enter his residence and thus needed a warrant, and (2) the officers' interrogation of him was custodial and thus violated his Fifth Amendment rights because no *Miranda* warnings had been given. For the reasons that follow, we affirm.

I

On the morning of January 6, 2016, a team of six law enforcement officers working with Homeland Security Investigations ("HSI") set out on a "knock and talk"

2

operation in a mobile home park in Robeson County, North Carolina. The team was led by HSI Special Agent Bryan Moultis and included Corporal José Hernandez, a detective in the Hoke County Sheriff's Office who spoke Spanish. At approximately 9:30 a.m., Agent Moultis and Corporal Hernandez approached the trailer that was Azua's residence to conduct a "knock and talk." At the time, Moultis was wearing a shirt with "police" written across the chest, was carrying a holstered firearm, and had his badge around his neck. Hernandez was also carrying a holstered firearm and was wearing a body cam that recorded the interaction that followed.

As Agent Moultis and Corporal Hernandez stood on either side of the front door of the trailer, Hernandez knocked on the door. After receiving no response, he continued to knock, saying "open the door" in Spanish. Hernandez then said, in English, "Publisher's Clearinghouse," and Moultis remarked that he could hear voices from inside the residence. Hernandez then knocked more forcefully and said in Spanish, "Open the door or we're going to knock it down," followed, in English, by "Police, open the door."

When Azua and his fiancée, Amaryllis Powell, who was pregnant with Azua's child, heard the officers' knocks and the threat to knock down the door, they became scared. But when Azua realized that it was police who were at the door, he instructed Powell to open it because, as he testified, "I knew nothing was going to happen to her." He also testified that he did not "believe that they were going to take the door down." Powell testified that when she opened the door following Azua's instruction, she did so "with consent" and found the officers to be "professional."

3

After Powell opened the door, Corporal Hernandez greeted her and asked if she was the only person home. She responded that she was. But when Agent Moultis commented that he and Corporal Hernandez had "heard a whole lot more footsteps than [hers]," Powell acknowledged that she was not alone. Moultis then asked Powell if she would "mind if we came in and talked to you" and remarked, "we'd like to talk to you . . . but it's awfully cold out here." Powell responded, "okay, you can come in" and gestured with her hand for the officers to come inside. As she opened the door wider, she again said, "okay, you can come in." Corporal Hernandez said that he "appreciate[d] it" and shook Powell's hand.

Agent Moultis, Corporal Hernandez, and one other officer then entered the trailer. The officers did not perform a security sweep, but they did request that Powell ask everyone in the trailer to come to the living room "just for safety reasons." At that point, Oscar Lopez, Azua's brother-in-law, who also lived at the residence, walked into the living room while Powell took a seat on the couch. As Agent Moultis began to explain why the officers were there, indicating that they had received information regarding illegal activity in the area, Azua walked into the room and took a seat on the couch next to Powell. Moultis greeted Azua by saying, "Hey man, how are you?" Moultis then asked Azua, Powell, and Lopez if there were any firearms in the trailer. Lopez responded that he was renting the trailer and owned some firearms. Moultis requested that Lopez complete a consent form authorizing the police to search the premises, and he also asked Lopez if a canine unit could come into the house to assist in the search. Lopez agreed.

4

While Lopez was filling out the consent-to-search form, Agent Moultis asked Azua and Powell where they were from originally. Powell responded that she was from North Carolina, and Azua responded that he was from Mexico, providing Moultis with his Mexican voter registration card as identification. Agent Moultis then gave Azua a questionnaire designed to determine a person's immigration status. He requested that Azua fill out the questionnaire, using phrases such as "I want you to start filling this out" and explaining that he wanted Azua "to answer every question."

While Azua was filling out the questionnaire, Agent Moultis told Lopez to come with him to the kitchen table, where Moultis asked Lopez questions regarding his firearms and reports of illegal activity in the area. While Agent Moultis spoke with Lopez, Azua and Powell sat on the couch alone as Azua completed the questionnaire.

When Azua had completed the questionnaire, Agent Moultis came back to the living room and took a seat on the couch to ask Azua about some of his answers. During the discussion, Moultis became suspicious of Azua's legal status. He asked Powell if she had begun the process for Azua to become an American citizen, and Powell said that she wanted to but had not yet done so. Agent Moultis then said to Azua, "You're going to have to help me out, because I can be a roadblock for that. I don't necessarily want to, but if I don't feel like you are being honest with me, I will be." Moultis further told Azua that, according to his questionnaire, he was "an illegal alien" and that he had "no status in the United States" and "should've never been here."

Agent Moultis then said to Azua, "Why don't you come with me, grab some shoes real quick, and we're going to go to my car real quick. We're not going to go anywhere,

5

we're just going to grab some fingerprints." As Azua rose from the couch, Corporal Hernandez told him to put on a jacket because it was cold outside, at which point Azua walked into another room to change clothes. Azua then came back and followed Agent Moultis to his vehicle where he allowed Moultis to fingerprint him. When Moultis ran a check of the prints, he learned that Azua's file contained two warrants for deportation. He thereupon arrested Azua, and placed him in handcuffs.

After Azua was indicted for illegal entry, in violation of 8 U.S.C. § 1326(a), he filed two suppression motions — the first seeking to suppress all statements made to officers in his residence and the second seeking to suppress all evidence taken from his person and property. Following a hearing, a magistrate judge recommended that Azua's motions be denied, concluding that Powell "gave voluntary and knowing consent for officers to enter the residence even if she heard Corporal Hernandez's comment about breaking down the door" and that Azua "was not in custody" so as to require *Miranda* warnings. The district court adopted the recommendation of the magistrate judge as its own and denied Azua's motions by order dated March 2, 2017.

A jury convicted Azua of illegal entry following trial, and the district court sentenced him to time served. He was then deported to Mexico.

II

Azua contends first that the law enforcement officers, operating without a warrant, gained entry into his residence through coercion — not by valid consent, as the officers claimed — by threatening to break down the door with "an implied claim of lawful

6

authority," in violation of the Fourth Amendment. Because the entry was illegal, he asserts, all statements he made and all evidence obtained following the entry should have been suppressed.

The district court, adopting the findings of fact made by the magistrate judge, disagreed with Azua, finding that the officers were granted entry voluntarily. The court found that the officers "approached the door of the residence in mid-morning, without drawn weapons and knocked repeatedly without yelling or violent pounding on the door" and that Azua "directed Powell to answer the door after recognizing the visitors as officers." It found further that "Powell was an adult fully capable of communicating consent" and that once she "opened the door, officers did not use hostile, accusatory or threatening language." Rather, the officers "in conversational tone asked for permission to enter to speak further because it was cold outside, and Powell freely and casually allowed [them] to enter." To the court, "[t]hese factors provide[d] significant evidence supporting a determination of voluntariness." While the court acknowledged that Corporal Hernandez's statements that the officers were with Publisher's Clearinghouse and that they would knock down the door weighed against finding consent, it reasoned that "when these statements are viewed in context . . . in light of the officers' actions and tone of delivery as seen on the video recording, they do not show that Powell's consent was 'coerced by threats or force, or granted only in submission to a claim of lawful authority'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973)). The court found that the "statements made and physical demeanor of the officers and Powell, both

7

before and after Powell answered the door, [stood] in stark contrast to circumstances in those cases where consent has been found involuntary."

It is, of course, well understood that "the Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Id.* (citation omitted). The question whether consent to search is voluntary — as distinct from being the product of duress or coercion, express or implied — is one "of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. And because the question is one of fact, review on appeal is conducted under the clear error standard. *United States v. Lattimore*, 87 F.3d 647, 650 (4th. Cir. 1996) (en banc).

In this case, we conclude that the district court did not clearly err in finding that the officers received voluntary consent to enter Azua's residence. The body cam footage, which is part of the record, shows that the encounter did indeed stand in "stark contrast" to those cases where consent was found to be involuntary. *See, e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) (finding consent to be involuntary where officers falsely claimed they had a warrant); *Gregg v. Ham*, 678 F.3d 333, 336–37, 342 (4th Cir. 2012) (finding consent to be involuntary where a physically disabled woman allowed an officer, who was armed with a shotgun, and three bail bondsmen into her home after the officer shook the door and said that she "had to let them come in or he was going to come

8

in"); *cf. United States v. Elie*, 111 F.3d 1135, 1145–46 (4th Cir. 1997) (finding consent to be voluntary where at least six officers were present), *abrogated in part on other grounds by Dickerson v. United States*, 530 U.S. 428 (2000). Azua's argument to the contrary depends almost entirely on Corporal Hernandez's statement, "open the door or we're going to knock it down."

While we do not condone Corporal Hernandez's statement — and the government has indeed rightly repudiated it — we nonetheless conclude that, in context, it did not fatally infect the voluntariness of the consent. The effect of the statement was limited, as demonstrated by the body cam footage, as well as by Powell's testimony. The footage convincingly shows that after Powell opened the door, the officers conversed with her in a calm, casual manner and that Powell freely and with a degree of graciousness invited the officers into the trailer. And Powell also testified that she had consented to the entry. With this evidence, we cannot conclude that the district court clearly erred in finding that consent to enter was given voluntarily. *See Schneckloth*, 412 U.S. at 233. Accordingly, we affirm the district court's ruling that the officers had valid consent to enter Azua's residence and therefore that their entry did not violate the Fourth Amendment.

## III

Azua also contends that after officers entered his residence, he "was in custody when he was interrogated by Agent Moultis, and Agent Moultis failed to inform him of his *Miranda* rights." He claims accordingly that his Fifth Amendment rights were violated. To support his argument, Azua points to the fact that officers obtained entry

9

into his residence by threatening to break the door down, causing him "to believe he was required to comply with any demand or request made by the officers." In addition, he notes that no officer "told him [that] he was not under arrest or that he was free to leave."

In concluding that the questioning of Azua was not a custodial interrogation, the district court found that Azua "was questioned on his couch in his living room in mid-morning, next to Powell, with [Lopez] also in the same room interacting with the officers" and that the "officers introduced themselves in conversational tone, without raising their voices, pulling weapons or using force on any person." It found that the "officers asked permission before bringing in a canine officer for a search," that the "officers did not isolate [the] defendant, and [the] defendant went to his room alone to put on warmer clothes before he followed Agent Moultis outside." The court found further that the "officers did not use threats or deception to obtain statements from [the] defendant, but rather truthfully described the subjects they were investigating." To the court, "[t]hese factors all support[ed] the non-custodial and voluntary nature of the statements given by [the] defendant." While the court did recognize factors weighing in favor of finding custody — namely, that the "officers never told [the] defendant he was not under arrest or free to leave"; that "Moultis instructed [the] defendant to fill out an immigration field questionnaire"; and that "Moultis suggested by his questions that [the] defendant was suspected of an immigration violation" — the court viewed these factors as insufficient "to transform the officers' visit into a custodial interrogation" when considering the totality of the circumstances.

10

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. And the Supreme Court has mandated the use of procedural measures to ensure that defendants, when subjected to custodial interrogations, are advised of their Fifth Amendment rights. *See Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). Thus, unless a defendant is advised of his Fifth Amendment rights pursuant to *Miranda* and voluntarily waives those rights, statements he makes during a custodial interrogation must be suppressed. *See United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017).

When determining whether an interrogation is custodial for purposes of *Miranda*, "a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest." *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (internal quotation marks, brackets, and citation omitted). "This inquiry is an objective one, and asks . . . whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 282–83 (internal quotation marks, brackets, and citation omitted); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (noting that the inquiry does not take into account "the subjective views harbored by either the interrogating officers or the person being questioned" (internal quotation marks and citation omitted)). And since the inquiry "calls for application of the controlling legal standard to the historical facts," it "presents a mixed question of law and fact qualifying for independent review." *Giddins*, 858 F.3d at 880 (internal quotation marks and citation omitted).

11

In this case, we conclude that the totality of the circumstances supports the conclusion that Azua was not in custody when questioned in his residence. For most of his interaction with the officers, Azua was seated next to Powell on the couch, where he elected to sit when entering the room, with the officers on the opposite side of the room. The officers' language, demeanor, and actions were calm and nonthreatening, and the tenor of the interaction remained conversational. While it is true that Agent Moultis, in explaining to Azua how to fill out the questionnaire, used command words of the kind used when giving instructions, the body cam footage convincingly supports the view that Moultis was not commanding Azua but simply explaining how to fill out the form in the manner that such instruction is typically given. And while Azua was undoubtedly intimidated during the interaction by having police in his home, especially in view of his immigration status, that intimidation appeared no greater than that which is characteristic of police questioning generally. And "police questioning, by itself, is unlikely to result in a [constitutional] violation." *INS v. Delgado*, 466 U.S. 210, 217 (1984) (observing in the context of a Fourth Amendment seizure that, "while most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response"). Moreover, Azua's questioning was markedly different from interrogations that have been found to be custodial. *See, e.g.*, *Hashime*, 734 F.3d at 280–81 (noting that officers, equipped with a battering ram, entered the defendant's home with guns drawn, ordered everyone outside, and subsequently questioned the defendant in a basement storage room for three hours); *United States v. Colonna*, 511 F.3d 431, 433–35 (4th Cir. 2007) (noting that officers

awoke the defendant at gunpoint after kicking his bedroom door open, kept the defendant under guard, and kept his family away from him while interrogating him for three hours in a police vehicle); *cf. United States v. Hargrove*, 625 F.3d 170, 177–82 (4th Cir. 2010) (concluding that a two-hour interview was noncustodial despite an initial pat-down search and an initial security sweep involving a number of officers who had their weapons drawn); *United States v. Parker*, 262 F.3d 415, 417–19 (4th Cir. 2001) (concluding that a 30-minute interview in a bedroom with the door closed was noncustodial).

Azua again relies heavily on Corporal Hernandez's statement that the officers would knock down the door, contending that the statement gave him "good reason to believe he was required to comply with any demand or request made by the officers." Azua seems to be arguing that Hernandez's statement tainted his entire interaction with the law enforcement officers, such that it necessarily rendered any following questioning custodial. But we agree with the district court that this argument is unpersuasive. Hernandez's statement was but one fact among many to be considered in determining the overall tenor of Azua's interaction with the officers, which was decidedly casual, nonhostile, and noncoercive.

Azua also points out that no one notified him that he was not under arrest or that he was free to leave and contends that Agent Moultis implied that he was a suspect. But the lack of such notification is not dispositive of the custody issue, *see Davis v. Allsbrooks*, 778 F.2d 168, 171–72 (4th Cir. 1985), and "even a clear statement by an

13

officer that the person being questioned is a suspect does not alone determine custody," *United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997).

In sum, considering the totality of the circumstances, Azua's "freedom of action" was not "curtailed to a degree associated with formal arrest," meaning that he was not in custody and *Miranda* warnings were therefore not required. *Hashime*, 734 F.3d at 282 (internal quotation marks and citation omitted). Accordingly, we conclude that the district court did not err in concluding that Azua was not subject to custodial interrogation in violation of the Fifth Amendment.

\*    \*    \*

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

14

BARBARA MILANO KEENAN, Circuit Judge, concurring:

I join the well-reasoned majority opinion in full. I agree that the district court did not clearly err in concluding under the totality of the circumstances, including the contemporaneous video recording, that Powell voluntarily permitted Corporal Hernandez and Agent Moultis to enter her home. I further agree that the district court did not err in concluding that Azua was not in custody for *Miranda* purposes when Agent Moultis questioned Azua in his home.

I nonetheless write separately to emphasize that the majority opinion should not be construed as deviating from this Circuit's well-established precedent that a defendant's alleged consent to a search of his property ordinarily will be deemed invalid when that consent was obtained through an "officer's misstatement of his or her authority." *United States v. Saafir*, 754 F.3d 262, 266 (4th Cir. 2014). The present case presents a rare exception to this general principle.

Here, the facts show that after knocking on the dwelling door, Corporal Hernandez stated in Spanish, "Open the door or we're going to knock it down." It is undisputed that Corporal Hernandez lacked the authority to forcibly enter the home, because he and Agent Moultis were engaging in a "knock and talk" without a search warrant and in the absence of exigent circumstances. *United States v. Cephas*, 254 F.3d 488, 494 (4th Cir. 2001) ("Warrantless entries into a residence are presumptively unreasonable."). Thus, Corporal Hernandez falsely implied that he had authority to execute his threat to "knock down" the door, and his threat was an affront to the very purpose of a "knock and talk," which is to make a brief, investigatory inquiry at a home. *See Westfall v. Luna*, 903 F.3d

15

534, 545 (5th Cir. 2018) (citation omitted); *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 192-93 (4th Cir. 2015).

Nonetheless, I am persuaded that Corporal Hernandez's statement, viewed in the context of the contemporaneous video recording, did not invalidate Powell's consent. Both the visual image and the audio components of the recording are of excellent quality. The recording shows that when Powell opened the door, Agent Moultis calmly greeted her. The two engaged in a nonconfrontational conversation, with Agent Moultis speaking in a modulated and relaxed tone. At the end of the conversation, Agent Moultis did not demand entry into the residence but, instead, asked if Powell would "mind if [the officers] came in and talked" because it was "awfully cold" outside.

This exchange captured on the video recording stands in "stark contrast" to circumstances in which we have held that an officer's use of false statements or threats rendered involuntary a defendant's purported consent. For example, we have held that law enforcement officers did not obtain voluntary consent to enter and search a home after falsely claiming to the occupant that the officers had obtained a search warrant. *United States v. Rush*, 808 F.3d 1007, 1009, 1011-12 (4th Cir. 2015); *see also Bumper v. North Carolina*, 391 U.S. 543, 548-50 (1968).

And, in our decision in *Saafir*, we discussed the coercive effect of an officer's false representation of authority to search a defendant's car. There, following a traffic stop, an officer noticed a "hip flask" commonly used to hold alcohol in the vehicle's driver's-side pocket. *Saafir*, 754 F.3d at 265. The officer falsely informed the driver that the flask provided the officer with probable cause to search the car. *Id.* In holding that

this false assertion of law fatally tainted the ensuing search in which a weapon was recovered, we emphasized that a search is unreasonable if it is based on law enforcement action "engaging or threatening to engage in conduct that violates the Fourth Amendment." *Id*. at 265-66 (quoting *Kentucky v. King*, 563 U.S. 452, 462 (2011)).

Other circuits likewise have emphasized that a defendant's purported consent to a search of his property will be deemed invalid when officers have misrepresented their authority, or illegally have threatened action based on an assertion of police authority. *See United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006) (holding that officers did not obtain valid consent to enter a home after ten minutes of persistent knocks and a demand by the officers that the occupant open the door); *United States v. Alberts*, 721 F.2d 636, 640 (8th Cir. 1983) (holding that an officer did not obtain valid consent to enter the property after the officer's false claim of having a valid search warrant); *United States v. Bolin*, 514 F.2d 544, 559-61 (7th Cir. 1975) (holding that officers did not obtain valid consent to enter the defendant's home after subjecting the defendant to custodial interrogation and threatening, without any basis, that the defendant's girlfriend would be arrested).

Here, the evidence shows that Corporal Hernandez's statement was, in effect, a misrepresentation of his authority to enter the home. After he made that statement, however, neither officer exhibited any other aggressive conduct. *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (considering the conditions under which consent is given in assessing voluntariness). In fact, the video recording demonstrates that Powell and the officers engaged in casual, nonconfrontational conversation, such that

17

any coercive effect from Corporal Hernandez's initial statement had dissipated by the time Powell motioned to the officers to enter the dwelling.

In my view, in the absence of such ameliorating context, a dishonest or reckless threat such as the one made by Corporal Hernandez would have been sufficiently coercive to invalidate Powell's consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (consent is a "fact to be determined from the totality of all the circumstances"); *Saafir*, 754 F.3d at 267. With this distinction in mind, I join in the majority opinion holding that the district court did not clearly err in concluding under the totality of the circumstances that Powell voluntarily consented to the officers' entry into her home.