**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-2187**

---

TAYLOR QUINN,

Plaintiff - Appellant,

v.

LIEUTENANT CHRISTOPHER K. ZERKLE; SERGEANT PAXTON LIVELY; SERGEANT RICK KEGLOR; DEPUTY BRANDON KAY; DEPUTY JAMIE MILLER,

Defendants - Appellees.

---

**No. 22-2188**

---

MARK TOON, as Personal Representative of the Estate of Eric Toon

Plaintiff - Appellant,

v.

LIEUTENANT CHRISTOPHER K. ZERKLE, West Virginia State Police, in his individual and official capacity; SERGEANT PAXTON LIVELY, Kanawha County Sheriff, in his individual and official capacity; SERGEANT RICK KEGLOR, Kanawha County Sheriff, in his individual and official capacity; DEPUTY BRANDON KAY, Kanawha County Sheriff, in his individual and official capacity; DEPUTY JAMIE MILLER, Kanawha County Sheriff, in his individual and official capacity,

Defendants - Appellees.

——————

Appeals from the United States District Court for the Southern District of West Virginia, at Charleston.  Irene C. Berger, District Judge.  (2:21-cv-00421; 2:21-cv-00427)

——————

Argued:  January 25, 2024                    Decided:  August 1, 2024

——————

Before WILKINSON, GREGORY, and HEYTENS, Circuit Judges.

——————

Reversed in part, affirmed in part, and remanded by published opinion.  Judge Gregory wrote the opinion, in which Judge Heytens joined.  Judge Wilkinson wrote an opinion concurring in part and dissenting in part.

——————

**ARGUED:**  William J. Forbes, FORBES LAW OFFICES, PLLC, Charleston, West Virginia, for Appellants.  Sylvester Allen Hill, Jr., CIPRIANI & WERNER, Charleston, West Virginia; Michael Deering Mullins, STEPTOE LLP, Charleston, West Virginia, for Appellees.  **ON BRIEF:**  Louis D. DiTrapano, Amanda J. Davis, CALWELL LUCE DITRAPANO, PLLC, Charleston, West Virginia; Jennifer N. Taylor, FORBES LAW OFFICES, PLLC, Charleston, West Virginia, for Appellants.  Robert Lee Bailey, STEPTOE & JOHNSON PLLC, Charleston, West Virginia, for Appellee Lieutenant Christopher Zerkle.  Allison Marie Subacz, CIPRIANI & WERNER, Charleston, West Virginia, for Appellees Sergeant Paxton Lively, Sergeant Rick Keglor, Deputy Brandon Kay, and Deputy Jamie Miller.

——————

2

GREGORY, Circuit Judge:

In August 2019, Eric Toon led West Virginia State Trooper Lieutenant Christopher K. Zerkle on an early morning high speed chase through Charleston, West Virginia, before returning home to his sleeping girlfriend, Taylor Quinn. Lt. Zerkle arrived at Toon's residence moments after Toon and was later joined by Appellees Sergeant Paxton Lively, Sergeant Rick Keglor, Deputy Brandon Kay, and Deputy Jamie Miller ("Kanawha Deputies"). The Kanawha Deputies banged on or near Toon's locked front door to announce their arrival, while Lt. Zerkle and another officer formed a perimeter around the house. The front door somehow unlocked and opened toward the Kanawha Deputies, who then entered the house. Almost immediately, Toon broke his bedroom window and jumped out of it armed with an AR-15. Toon and the rifle fell to the ground. Toon then rose to all fours, grabbed the rifle and pointed it at another officer from the ground. That officer and Lt. Zerkle opened fire, fatally wounding Toon, and injuring Quinn, who had followed Toon out of the window.

Quinn and Toon's estate (the "Estate") separately asserted various claims related to the Kanawha Deputies' warrantless entry into the Toon residence, and Lt. Zerkle's fatal shooting of Eric Toon and non-fatal shooting of Taylor Quinn. The Kanawha Deputies and Lt. Zerkle moved to dismiss, and the district court granted their motion in part and denied it in part. After discovery, the Kanawha Deputies and Lt. Zerkle separately moved for summary judgment on the remaining claims. The district court granted both motions and Appellants now appeal.

3

Because we conclude that factual disputes preclude summary judgment on Appellants' warrantless entry claims and Quinn's excessive force, battery, and trespass claims, we reverse the district court's decision as to those claims. Without determining whether the officers are entitled to qualified immunity as the district court held, we affirm the court's decision on all remaining claims on the grounds that there are no material disputes of fact and therefore Appellees are entitled to judgment as a matter of law as to those claims.

I.

On the morning of August 1, 2019, Lt. Christopher Zerkle responded to a report of a domestic violence incident. While en route to the location of the incident, Lt. Zerkle observed two men, later identified as Eric Toon and Noah Sutherland, sitting on a parked motorcycle in a private lot. Sutherland, the passenger, was not wearing a helmet, but Lt. Zerkle saw no need to address the men because the motorcycle was not in motion. Lt. Zerkle eventually found the couple who was involved in the domestic altercation and began speaking to them.

While Lt. Zerkle was speaking to the couple, he noticed Toon and Sutherland approaching him on the motorcycle. Sutherland still was not wearing a helmet, so Lt. Zerkle pursued the motorcycle on that basis. Toon fled and led Lt. Zerkle on a chase at speeds sometimes exceeding 100 MPH. At some point, Lt. Zerkle called in the pursuit, which prompted a dispatcher to put out a BOLO (be on the lookout) to other state troopers and Metro 911. Lt. Zerkle followed the motorcycle from 8:54 a.m. until 8:59 a.m., when

4

he told dispatch that he lost sight of the motorcycle and was terminating the pursuit due to traffic conditions.

Although he had formally terminated the chase, Lt. Zerkle continued to investigate and quickly learned what neighborhood Toon lived in with the help of the couple from the domestic dispute and others in the area. Toon and Sutherland arrived back at Toon's house at 9:12 a.m., ditched the motorcycle and ran inside. Lt. Zerkle arrived seconds later, followed shortly thereafter by officers from the Kanawha County Sheriff's Department and Charleston Police Department. One of the officers on the scene located Toon's motorcycle and helmet with the help of his K-9 and tracked a scent to the front door of Toon's house. Lt. Zerkle and Charleston Police Officer Charles Whittington ("Cpl. Whittington") then knocked on Toon's front door, but no one answered.

Meanwhile, inside the home, Quinn awoke to Toon toting an AR-15 and informing her that officers had followed him home. J.A. 681; *but see* J.A. 814 (Sutherland's testimony that Toon did not arm himself before the officers entered the home). Quinn suggested that they pray and that she speak to the officers. Toon refused her latter suggestion and commanded that no one open the door or speak to the officers. Toon, Quinn, and Sutherland watched footage of the officers on a TV in the bedroom that was connected to cameras facing the front porch area, including the front door. At some point while they were in the bedroom, Toon instructed Sutherland to check the front door to ensure that it was locked. Sutherland left the bedroom twice to comply with that request. Quinn and Toon never left the bedroom area.

5

Outside the home, after Lt. Zerkle's knock went unanswered, Lt. Zerkle and Cpl. Whittington left the front porch, and the Kanawha Deputies convened on the porch while Lt. Zerkle and Cpl. Whittington attempted to cover the perimeter of the home. With Sergeant Keglor close by, Sergeant Lively initiated a K-9 "knock and announce," yelling "Kanawha County Sheriff's Office, K-9, come out, call out, or we'll send the dog, and he will bite" while "banging on the door" or "on the side" of the home. J.A. 1193. Sgt. Lively gave this announcement twice before he and the other officers heard movement on the other side of the door. As Sgt. Lively attempted to make the announcement for the third and final time, the door opened outward toward the Kanawha Deputies. They then entered the home and split up in pairs in each direction.

When the Kanawha Deputies entered the house, Toon broke the bedroom window using the AR-15 and jumped out of the broken window, rifle in hand. Toon and the gun fell to the ground. While lying on the ground, Toon grabbed the gun and lifted it in Cpl. Whittington's direction. Lt. Zerkle and Cpl. Whittington then fired their weapons at Toon, whose torso fell completely to the ground after the shots. Quinn, who followed Toon out of the broken window, testified that she blacked out before jumping from the window and when she regained consciousness, she was lying on the ground bleeding. J.A. 690. She further testified that she did not recall any shots being fired before she jumped out the window but that she believed she was shot while still in the window or in the air. J.A. 684–85. According to Quinn, Sutherland did not jump out of the window until he was instructed by officers to do so and, although he was not injured, he somehow had blood on his pants leg. J.A. 688.

6

II.

Quinn filed a lawsuit in the Circuit Court for Kanawha County, West Virginia, and Appellees removed that case to the United States District Court for the Southern District of West Virginia. Mark Toon, as personal representative of the Estate, filed a separate lawsuit in the district court and the court consolidated the cases. The district court later dismissed some of the claims Appellants asserted for failure to state a claim and set a discovery schedule for the following claims:

- The Estate's § 1983 warrantless entry claim against Lt. Zerkle (premised on a bystander liability theory) and the Kanawha Deputies;

- The Estate's § 1983 excessive force claim against Lt. Zerkle;

- Quinn's §1983 warrantless entry and state law trespass claims against the Kanawha Deputies; and

- Quinn's §1983 excessive force and state law battery claims against Lt. Zerkle.

Following discovery, the Kanawha Deputies and Lt. Zerkle separately moved for summary judgment on all remaining claims asserted against them. Quinn and Toon opposed the motions, contending that various disputes of fact prohibited summary judgment.

The district court granted both motions for summary judgment. The court found that the officers banged on the locked door and announced their presence before the door opened outward toward them. *Quinn v. Zerkle*, No. 2:21-CV-00421, 2022 WL 15316600, at *7 (S.D.W. Va. Oct. 26, 2022). The court concluded that, under those circumstances, any reasonable officer would have believed that someone in the house opened the door and granted consent in response to the knock and announce. *Id*. Specifically, the court said:

7

> Whether the door was somehow jostled open, opened by the rumored giant rats that Ms. Quinn testified prompted her and Mr. Toon to set a bear trap in their kitchen, or deliberately opened by one of the occupants of the house intending for the officers to enter while they fled through the window, the relevant facts are those perceived by the officers at the time. They perceived that the previously locked door opened in response to their knock and announce.

*Id*. The court recognized that an open door does not necessarily grant consent because a person may open a door for several reasons. *Id*. However, it found that because the door opened without anyone waiting on the other side to clarify the scope of consent, anyone in the officers' position would presume that someone opened the door then stepped back into the darkened house away from the entrance permitting them to enter. *Id*.

The court also held that even if the Kanawha Deputies unlawfully entered Toon's home, they were entitled to qualified immunity because it was not clearly established in the Fourth Circuit that someone opening a door in response to a knock and announce, then stepping away from the door's entrance, would not constitute implied consent to enter. *Id*. at *8. Having determined that the entry was constitutional and that the Kanawha Deputies were entitled to qualified immunity, the court granted summary judgment on Appellants' § 1983 warrantless entry claims and Quinn's state law trespass claim. *Id*. It also determined that the Estate's warrantless entry claim against Lt. Zerkle premised on his failure to intervene to prevent the warrantless entry likewise failed. *Id*.

The court then turned to the parties' excessive force claims. It said that Toon's claim was "frankly, not a close call" because it was "difficult to imagine" an officer who would not feel threatened and respond in kind to the threat the armed Toon presented. *Id*. at *9. According to the court, Lt. Zerkle (and Cpl. Whittington who was not a defendant

8

in the case below) used force only after Toon, who was aware that officers were at his home to pursue him, jumped out of the window holding an AR-15 and raised the rifle in Cpl. Whittington's direction. *Id*. The court noted that while its view of Toon's arguments may have been different if Toon was not armed, given that Toon pointed the gun at an officer, there was no material dispute regarding whether Lt. Zerkle reasonably used deadly force against him. *Id*.

Recognizing that Quinn's excessive force claim was more complicated because it was undisputed that she was unarmed and did not pose a threat to anyone, the court ventured to determine whether Quinn "presented evidence that would permit a jury to find that Lt. Zerkle intended to shoot her." *Id*. at *10. The court found that all shots were fired within two seconds, Quinn "had fully exited the window and gotten to her feet within ten seconds of the shooting," and Quinn was shot in the back/shoulder, which the court said was "consistent with her facing the house as she dropped from the window." *Id*. According to the court, on these facts, no reasonable juror could conclude that Lt. Zerkle saw Quinn and intentionally shot at her during the encounter. *Id*.

Instead, it said, "[t]he only reasonable inference from the facts presented is that Ms. Quinn exited the window seconds after Eric Toon and was dropping to the ground behind him at the same time Cpl. Whittington and Lt. Zerkle opened fire." *Id*. The court therefore found that Quinn was not Lt. Zerkle's intended target and was instead accidentally injured by his reasonable use of force on Toon. *Id*. Based on those findings, the court granted Lt. Zerkle summary judgment on Appellants' excessive force claims and Quinn's battery claim. It also granted the Kanawha Deputies summary judgment on Toon's bystander

9

liability claim premised on their alleged failure to intervene to prevent the fatal shooting. *Id*. at \*11.  Quinn and the Estate timely appealed.

## III.

We review district court decisions on motions for summary judgment and qualified immunity de novo.  *See Franklin v. City of Charlotte*, 64 F.4th 519, 529 (4th Cir. 2023). In deciding such motions, "we may not credit the movant's contrary evidence, weigh the evidence, or resolve factual disputes in the movant's favor, even if a jury could well believe the evidence forecast by the movant."  *Aleman v. City of Charlotte*, 80 F.4th 264, 297 (4th Cir. 2023).  Rather, we must view the undisputed facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party to determine whether there is a genuine dispute as to any material fact.  *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  A material fact is one that "might affect the outcome of the suit under the governing law," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding this appeal, we must draw all reasonable inferences in favor of the Estate and Quinn to determine whether there are any facts that could lead a jury to find in their favor.

## IV.

Section 1983 provides a vehicle for plaintiffs to assert claims against anyone who, under the color of law, subjects them to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.

10

Law enforcement officers sued in their individual capacities under § 1983 may rely on the doctrine of qualified immunity, which protects government officials from "bad guesses in gray areas and ensures that they are liable only for transgressing bright lines" in defense of their actions. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (internal quotation marks omitted). Successful invocation of qualified immunity shields the officer from liability, provided his conduct did not transgress "clearly established statutory or constitutional rights of which a reasonable person would have known." *Franklin* 64 F.4th at 529–30. Our job in reviewing an award of qualified immunity at the summary judgment stage "is to consider whether there are any material disputes of fact . . . that, when resolved, would amount to the violation of a clearly established constitutional right. If there are, summary judgment is inappropriate." *Id.* (*quoting Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022) (internal quotations and citations omitted).

A.

The Fourth Amendment prohibits violations of one's right to be secure against "unreasonable searches and seizures." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021). Reasonableness is "the ultimate touchstone of the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). In the context of searches or seizures of a person's home, reasonableness "generally requires the obtaining of a judicial warrant," *Riley v. California*, 573 U.S. 373, 382 (2014) (internal quotation marks omitted), though that requirement is not absolute. *Brigham City*, 547 U.S. at 403 (The "warrant requirement is subject to certain exceptions."). Valid consent is one recognized exception to the general prohibition against warrantless entries into one's home. *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001).

11

Validity is determined based on the totality of the circumstances and exists only where an individual knowingly and voluntarily grants his consent. *Id.* ("Consent to search is valid only if it was knowing and voluntary and courts assess validity based on the totality of the circumstances.") (quotations omitted). Where an officer maintains that the consent on which he relied was implied, we ask "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Neely*, 564 F.3d 346, 350 (4th Cir. 2009) (*quoting Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The Kanawha Deputies entered Toon's home when the previously locked front door opened toward them before they completed their third and final knock and announce. They contend that the door opening was enough evidence of consent for them to enter the home, although they had not interacted at all with the individuals inside the home. Under the Kanawha Deputies' theory, any officer would be authorized to enter a person's home simply because the door opened after the officer knocked. This would be true even if the person opened his door following a knock to determine the knocker's identity and the reason for the knocker's visit. And it would remain true if the door opened because of the wind, a child, a pet, or simply because the lock malfunctioned.

The potential implications of this theory are especially troubling considering that some modern locks are electronic, battery operated, and/or controlled remotely (using apps, for example). Under this theory, if a technological failure causes a door with an electronic lock to open, an officer who happens to be waiting to question or arrest a suspect in that home would be free to enter without any affirmative sign of consent from the occupants simply because the door opened. Once inside, the officer could look for the suspect, or

12

otherwise roam around the house under the presumption of implied consent that the Kanawha Deputies would have us create here. This line of reasoning cannot stand under the Fourth Amendment, which prohibits warrantless entries into anyone's home with few exceptions, and therefore must be rejected. *Brigham City*, 547 U.S., at 403.

What's more, we also reject the Kanawha Deputies' proposition for another reason—it requires us to impermissibly weigh the evidence and draw inferences in the Kanawha Deputies favor. It is not our role (nor that of the district court) to weigh the facts or adopt the Kanawha Deputies account of the events as the only possible conclusion. In fact, at this stage of the litigation, even if a reasonable juror could conclude that the Kanawha Deputies believed that someone unlocked the door, summary judgment is precluded here if evidence in the record could persuade the same juror otherwise. That is, Appellants' claims must survive if the evidence in the record supports them. We find that it does.

It is undisputed that the door was locked when Lt. Zerkle and Cpl. Whittington initially approached it and when Sgt. Lively began to knock and announce. It is also undisputed that Sgt. Lively knocked and announced twice and that the door opened outward as he tried to conduct the third and final knock and announce. According to the record, one knock and announce consists of announcing the officers' presence while "banging on the door or the wall near the door three times." J.A. 258. It is therefore undisputed that Sgt. Lively banged on or near the door at least six times before the door opened. We also know that Lt. Zerkle knocked on the door at least once. J.A. 455.

Witnesses for both parties testified that the door and lock at issue here were atypical. Quinn testified that Toon made the lock himself. Quinn said the lock closed by "slid[ing]

13

shut" and consisted of a "hole in the wall with a breaker bar," "a bolt twisted," and a "little piece of metal welded to the front door to keep the bolt in place." J.A. 735.

As a threshold matter, should a juror find Quinn credible, the juror could conclude that Toon explicitly expressed that he did not want the officers in his home. That alone could refute the officers' claims of consent at least as it pertains to the Estate's warrantless entry claim. *See Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (holding that "a physically present co-occupant's stated refusal to permit entry . . . render[ed a] warrantless search unreasonable and invalid as to him."). Moreover, drawing all inferences in Appellants' favor, one could conclude that the officers were aware that the flimsy door could not withstand the amount of pressure they applied and opened because of their repeated banging on or near the door, Sgt. Lively's pull on it, *see* J.A. 930, the force from his last knock, or something else, and therefore not because someone inside unlocked it. Under that interpretation of the facts, a reasonable juror could conclude that the Kanawha Deputies did not reasonably believe that they had consent to enter the home and did so anyway in violation of the Fourth Amendment. Because that account of the events is supported by the record, the district court erred in concluding that the Kanawha Deputies' account was the only reasonable inference one could draw from the evidence.

Moreover, even if someone inside the home had unlocked the door, that fact alone is insufficient to demonstrate implied consent. Although we have not had the opportunity to address this scenario before now, we find the principles articulated by the Supreme Court in *Lange v. California*, in the context of the hot pursuit exception, persuasive on this issue. 141 S.Ct. 2011, 2016 (2021) (holding that pursuit of a suspected misdemeanant does not

14

present an exigent circumstance and therefore does not justify a warrantless entry into a suspect's home, absent another Fourth Amendment exception).

As the Supreme Court explained, it is well-established that "when it comes to the Fourth Amendment, the home is first among equals." *Id*. at 2018 (citation and quotation omitted). That "centuries-old principle," the Court said, flows from our nation's English roots in which a man's house was his castle, entitled to special protection, including freedom from warrantless entry. *Id*. at 2018, 2023. The Court held that, while in some cases the circumstances of a pursuit may present an emergency that justifies warrantless entry, generally, an officer must obtain a warrant prior to entering a suspected misdemeanant's home, even where the suspect has fled. *Id*. at 2021–22.

The Kanawha Deputies do not contend that they entered the home in hot pursuit of Toon for any crimes. In fact, they explicitly denounce the hot pursuit theory, stating that it is irrelevant to this appeal, and elect instead to rely solely on implied consent to proclaim the constitutionality of their actions. Resp. Br. 1. That consent, they argue, was understood because the door opened toward them. Under that theory, the opened door here is no different than the open garage in *Lange*, and, as in *Lange*, the officers entered Toon's home simply because there was an opportunity to do so. Nevertheless, the Kanawha Deputies urge us to disregard the rationale articulated in *Lange* and conclude that an officer may invite himself into one's home, without ever interacting with the owner or anyone else, whenever presented with an opportunity to do so, unless of course he is in pursuit of a suspected misdemeanant.

15

Not only does that proposition contradict our precedent which requires us to determine the reasonableness of an officer's belief based on an exchange between the officer and another person, *Neely*, 564 F.3d at 350, it defies common sense. Indeed, as the district court recognized, a person opening a door does not constitute consent to enter because anyone "might open a door in response to a knock, expecting the person on the other side of the threshold to explain the reason for their visit prior to determining whether to invite them in." Quinn at *7. It also defies logic under the Supreme Court's decision in *Lange*. The Kanawha Deputies essentially invite us to establish that only the pursuit of a suspected misdemeanant precludes law enforcement from entering a suspect's home through an open entry point without first having an interaction with anyone from which the officer could infer consent to enter the home. Acceptance of such an invitation would require us to assume that the Constitution affords a protection to one suspected of a crime that it denies one who is not. We decline to make such an illogical assumption. For those reasons we find the Kanawha Deputies' arguments unpersuasive and conclude that officers may not assume consent to enter a suspect's home simply because a door opens.

Finally, even if someone inside the home had unlocked and opened the door intending to grant the officers consent, a reasonable juror could still conclude that the officers' entry was unjustified and unconstitutional on the facts of this case. As indicated above, only valid, voluntary consent is an exception to the general prohibition against unreasonable seizures. *Trulock*, 275 F.3d at 401; *see also Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (stating that warrantless entry is permitted where "police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority

16

over the area in common"). "Voluntariness is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973). And an individual who grants consent under duress or threats of physical harm cannot be said to have done so voluntarily. *See United States v. Azua-Rinconada*, 914 F.3d 319, 324 (4th Cir. 2019) (stating that "[t]he question whether consent to search is voluntary — as distinct from being the product of duress or coercion, express or implied — is one of fact to be determined from the totality of all the circumstances").

Here, Sgt. Lively yelled "Kanawha County Sheriff's Office, K-9, come out, call out, or we'll send the dog, and he will bite" as he knocked on the door. J.A. 258, 514. One could conclude that anyone who may have opened the door did so not of his own volition, but to avoid being bitten by Sgt. Lively's dog for failure to acquiesce to Sgt. Lively's commands. Under that interpretation of the facts, a reasonable juror could conclude that while an occupant may have intended to grant consent, the consent was invalidated by the threat. *See Bumper v. State of North Carolina*, 391 U.S. 543, 548–49 (1968) (The government cannot prove consent "by showing no more than acquiescence to a claim of lawful authority.").

i.

The Kanawha Deputies contend that even if this Court concludes that their understanding of consent was unsound, as we have, they are still entitled to qualified immunity. This is so, they say, because we have not addressed a factually analogous case sufficient to establish that entering a residence when a previously locked door opens in

17

response to officers knocking, but no one comes to the door or interacts with the officers in anyway, violates the Fourth Amendment.

The Kanawha Deputies' contention overstates the facts and misapprehends the law. As to the facts, they maintain that the door opened *in response to* their knocking, but the record supports only the conclusion that it opened *following* the officers' knocking. Compare Resp. Br. 34, *with e.g.*, J.A. 512 ("Sergeant Lively starts his third callout. And then when he knocks on the door, the door goes open."). The former suggests a causal connection that we cannot infer at this stage of the litigation, while the latter merely states what happened. With respect to the law, the Kanawha Deputies seem to misunderstand what it means for a right to be "clearly established" to prevent a qualified immunity defense. Contrary to their suggestion, we need not have recognized a right on identical facts for it to be deemed clearly established. *Aleman v. City of Charlotte*, 80 F.4th 264, 295 (4th Cir. 2023). Rather, we will deny a claim of qualified immunity where we determine that officers in the Fourth Circuit have been provided "fair warning, with sufficient specificity," that their actions would violate the Constitution. *Id*.

As noted above, the right against warrantless searches and seizures has been a part of our nation's values since its founding. *Lange*, 141 S. Ct. at 2022–23. Given the importance of this right, it is enforced subject to very few exceptions, which must be adequately demonstrated on the record to justify any deviation from the general prohibition. *Id*. at 2018–19. This Court has recognized implied consent only where it could be inferred based on conduct of the suspect or another occupant in the presence of the officer. Indeed, in each of the cases in which we have recognized implied consent, the

18

officers' understanding was premised on an interaction with a person presumed to have authority to consent. *See Hylton*, 349 F.3d at 786 (finding consent where girlfriend moved from the couch to permit an officer to search under it); *United States v. Wilson*, 895 F.2d 168, 170 (4th Cir.1990) (finding consent where defendant raised his arm after agent asked him permission for a pat down search); *United States v. Wilson*, 895 F.2d 168, 170 (4th Cir.1990) (finding consent where defendant raised his arms after agent asked permission to pat him down). And, as noted above, we have explicitly stated that the appropriate inquiry in this context is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Neely*, 564 F.3d at 350. It was therefore well established in August 2019 that implied consent must be based on inferences an officer draws from the conduct of someone at least presumed to have the ability to authorize consent.

It was also settled that consent is not voluntary where it is the product of duress. *See Azua-Rinconada*, 914 F.3d at 324 (recognizing that consent that is the product of "duress or coercion" is not voluntary); *see also United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (stating that "the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)" are relevant in determining whether the consent was voluntary). Against that backdrop, a reasonable officer in the Kanawha Deputies' position should not have concluded that a previously locked door opening toward them, without more, constituted implied consent to enter the home. The Kanawha Deputies are therefore not entitled to qualified immunity.

19

B.

The Estate asserts a bystander liability claim against Lt. Zerkle on the grounds that Lt. Zerkle failed to intervene to prevent the Kanawha Deputies' warrantless entry into Toon's home.  The district court dismissed this derivative claim without assessing it on the merits because it held that the Kanawha Deputies' entered the home with consent and thus that their entry was constitutional.  Because we disagree with the court's conclusion on Toon's warrantless entry claim, we now assess his failure to intervene claim on the merits.

"The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002).  It establishes that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Id*. at 203–04.  An officer may only be held liable under a bystander liability theory in connection with a constitutional violation where the officer knows that a fellow officer is violating an individual's rights, has a reasonable opportunity to prevent the violation, and chooses not to intervene. *Id*.

It is undisputed that the door was locked when Lt. Zerkle and Cpl. Whittington initially knocked on it, and that Lt. Zerkle did not believe that he had a constitutional basis to enter the residence at the time that he knocked.  The Estate makes much of these facts insinuating that because Lt. Zerkle knew that he did not have a basis to enter, it must necessarily follow that he knew that the Kanawha Deputies could not enter either.  *See* Resp. Br. 42.  The Estate did not cite a single legal authority to support its position or direct

20

this Court's attention to any facts suggesting that Lt. Zerkle had actual knowledge that the Kanawha Deputies' entry into the residence was unconstitutional as required to save his claim. That alone is sufficient to affirm the district court's decision.

Furthermore, even if we inferred Lt. Zerkle's knowledge from his determination that he could not force entry into the home, as the Estate urges us to do, its claim would still fail because it has not proffered facts sufficient to demonstrate that Lt. Zerkle had a reasonable opportunity to prevent the Kanawha Deputies from entering the home. According to the record, the Kanawha Deputies entered the home immediately after the front door opened outward, when Sgt. Lively attempted to complete his final knock and announce. At that time, Lt. Zerkle was on the perimeter of the home with his sights on the bedroom window that Toon ultimately broke and escaped through. Nothing in the record suggests that Lt. Zerkle could have prevented the Kanawha Deputies actions between the time the door opened and the time they entered. The Estate's bystander liability claim therefore fails.

## C.

Next, Appellants both assert an excessive force claim. A claim that a law enforcement officer used excessive force—deadly or not—during any seizure of a person is analyzed under the Fourth Amendment reasonableness standard. *Franklin*, 64 F.4th at 530–31. In this context, the reasonableness of use of force is determined based on the factors announced by the Supreme Court in *Graham v. Connor*: (1) "the severity of the crime"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest." 490

21

U.S. 386, 396 (1989). Ultimately, we must determine whether the officer had probable cause to believe that the suspect posed an imminent threat of serious physical harm to anyone at the very moment the deadly force was used. *See Stanton v. Elliott*, 25 F.4th 227, 233–34 (4th Cir. 2022). Excessive force analyses are fact specific, and the second *Graham* factor is particularly significant where the force was deadly. *Franklin*, 64 F.4th at 531.

It is undisputed that Toon jumped out of his bedroom window holding an AR-15. Nevertheless, the Estate argues that the officers should not have used deadly force against Toon because he did not pose an immediate threat to their safety, never made it to his feet, and did not raise the rifle before being shot. Fatal to its claim, The Estate's interpretation of the record is belied by Cpl. Whittington's body cam footage, which shows Toon on the ground pointing an AR-15 in Cpl. Whittington's direction.

We have consistently held that an officer need not wait until a gun is pointed at him to act. *See Anderson v. Russell*, 247 F.3d 125 (2001); *see also Stanton v. Elliott*, 25 4th 227, 234 (4th Cir. 2022) ("A police officer need not wait for a suspect to shoot before using deadly force."). A natural corollary to that rule is that an officer is entitled to use deadly force when a rifle is pointed directly at him or another officer in his presence. Lt. Zerkle and Cpl. Whittington opened fire on Toon after Toon pointed a rifle in Cpl. Whittington's direction. Because it was reasonable for Lt. Zerkle to use deadly force to prevent Toon from shooting a fellow officer, he is entitled to summary judgment on Toon's excessive force claim.

The same cannot be said with respect to Quinn's claim. Lt. Zerkle maintains that he accidentally shot Quinn when he lawfully shot at Toon. If true, this fact would legally preclude Quinn's excessive force claim because liability under § 1983 must be premised

22

on a state actor's intentional unconstitutional conduct. *Schultz v. Braga*, 455 F.3d 470, 480 (4th Cir. 2006) ("[A] seizure within the meaning of the Fourth Amendment always requires an intentional acquisition of physical control, it does not extend to accidental effects or unintended consequences of government action.") (internal quotations and citation omitted). Thus, Lt. Zerkle cannot be held liable under § 1983 for injuries Quinn sustained from bullets he intended for Toon. Although Lt. Zerkle's position finds some support in the record, his account presents but one conclusion a reasonable juror could come to. Because the record also supports the conclusion that Lt. Zerkle intentionally shot an unarmed Quinn as she exited or fell from the window, Quinn's claim must proceed.

Cpl. Whittington testified that the bedroom window Toon and Quinn jumped from was approximately eight feet above the ground. J.A. 1522–23. His body camera shows Toon collapse while on the ground and shows Quinn on her feet after the shooting before she stumbles and falls to the ground. Sutherland testified that it was not possible for Toon and Quinn to exit the window simultaneously because of Toon's size. J.A. 811. The parties agree that Quinn jumped out of the window only seconds after Toon, and that all shots were fired within a matter of seconds. Quinn testified that she jumped out of the window feet first, was shot in the right shoulder/back area, and that her blood was on Sutherland's pants, even though he did not jump out of the window until after the shooting. J.A. 684–85, 688.

The record before us could support the conclusion that Lt. Zerkle aimed at and intentionally shot Quinn. Lt. Zerkle maintains that he shot only at Toon who we know was on the ground. It is not clear whether Quinn was shot while she was in the window eight feet above the ground, in the air falling from the window, standing upright on the ground,

23

or in another position altogether.  However, given that we do not know Quinn's position at the time she was shot, it is plausible that Quinn was far enough from Toon when she was shot, that she would not have been hit by a stray bullet meant for him.  For example, if Quinn was standing upright, her right back or shoulder (where she was shot) would have been several feet above the ground and above Toon, the alleged intended target.  Alternatively, a reasonable juror might infer that Quinn was shot while standing in the window based on her testimony that her blood was on Sutherland's pant leg and that he did not jump out of the window until the officers directed him to do so.  Under either scenario, one could conclude that Lt. Zerkle aimed above the ground and shot Quinn, thereby rendering his use of force against her intentional and potentially unconstitutional.[*]

V.

The district court dismissed Quinn's state law claims on the same grounds that it granted summary judgment on the related federal claims.  *See e.g. Quinn v. Zerkle*, 2022 WL

---

[*] We pause here to note that our discussion of whether Lt. Zerkle intentionally shot Quinn does not suggest that our Court will consider an officer's underlying motive or intent in assessing whether the officer reasonably employed force.  To clarify, at issue in this case, is whether a reasonable juror could conclude that Quinn was not shot accidentally or hit by a bullet meant for Toon, not Lt. Zerkle's subjective reason for shooting Quinn.  Thus, this case concerns whether Lt. Zerkle at all intended to seize or use excessive force against Quinn and does not alter our long-standing principle that "[s]ubjective factors involving the officer's motives, intent, or propensities are not relevant" to our excessive force analysis.  *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994) ("Subjective factors involving the officer's motives, intent, or propensities are not relevant."); *see also Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2011) (stating that "an officer's good intentions do not make objectively unreasonable acts constitutional."); *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) ("We do not consider the officer's intent or motivation.").

24

15316600, at *8 (granting summary judgment on Quinn's trespass claim after finding that the Kanawha Deputies entered the Toon residence with consent); *id*. at 11 (granting summary judgment on Quinn's battery claim based on its determination that there was no evidence that Lt. Zerkle intended to shoot Quinn). Having determined that the district court erred in dismissing Quinn's warrantless entry and excessive force claims, we now assess her state law trespass claim against the Kanawha Deputies and battery claim against Lt. Zerkle.

Under West Virginia law, a trespasser is "one who goes upon the property or premises of another without invitation, express or implied, and does so out of curiosity, or for his own purpose or convenience, and not in the performance of any duty to the owner." *Ragonese v. Racing Corp. of W. Virginia*, 234 W. Va. 706, 710 (2015). It is clear from the record that the Kanawha Deputies entered Toon's home for their own purposes and not in service to Toon and Quinn. Thus, as was the case with its § 1983 counterpart, whether the trespass claim survives depends on whether the Kanawha Deputies had consent to enter Toon's home. Because the analysis at this stage is materially identical, the parties' trespass claims must proceed for the reasons we articulated above with respect to their § 1983 warrantless entry claims. The Kanawha Deputies are also not entitled to qualified immunity under West Virginia law, which applies the federal standard. *See Robinson v. Pack*, 223 W. Va. 828, 834 (2009) (stating that an officer will be immune from personal liability "if the involved conduct did not violate clearly established laws of which a reasonable official would have known").

Similarly, because we cannot determine whether Lt. Zerkle intentionally shot Quinn, his challenge to her battery claim fails for the same reasons we articulated with

25

respect to her excessive force claim. A person may be liable for battery in West Virginia if he "acts intending to cause a harmful or offensive contact with the person of the other or a third person" and "a harmful contact with the person of the other directly or indirectly results." *W. Virginia Fire & Cas. Co. v. Stanley*, 216 W. Va. 40, 51 (2004). Thus, if the jury concludes that Lt. Zerkle intentionally shot Quinn, he may be held liable for battery under West Virginia law. He could also be liable if the jury concludes that he intended only to shoot Toon because Quinn's injuries resulted from his intent to harm a third person. Thus, even under Lt. Zerkle's interpretation of the facts, he could be liable for battery under West Virginia law irrespective of whether he is liable under federal law. Quinn's battery claim therefore also survives.

## VI.

For the foregoing reasons, we reverse the district court's decision regarding Appellants' § 1983 warrantless entry claim against the Kanawha Deputies, Quinn's § 1983 excessive force and state law battery claims against Lt. Zerkle, and Quinn's state law trespass claim against the Kanawha Deputies. We affirm the court's decision regarding the Estate's § 1983 claims excessive force and failure to intervene against Lt. Zerkle. We remand for further proceedings consistent with this opinion.

*REVERSED IN PART, AFFIRMED IN PART, AND REMANDED*

26

WILKINSON, Circuit Judge, concurring in part and dissenting in part:

I concur in those parts of the majority opinion rejecting Toon's claims of excessive force and bystander liability. I also concur in that part of the opinion denying qualified immunity on the issue of the homeowner's consent to the search. It is well established that consent need not be verbal to be valid. *See United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003). But here, there was a lack of objective manifestation of consent to justify the officers' entry into the home.

We do not know why the door to Toon's home was open. Perhaps the door was loosely hinged or imperfectly locked. Perhaps some cherubic breeze nudged it open. Perhaps the door was popped open by the officers' incessant banging. Perhaps it is best that the mystery of the open door remain a mystery until it is solved by a jury. Regardless, the mystery in its present state is insufficient to denote consent. And without a showing of consent, the officers are not entitled to qualified immunity on their entrance into Toon's abode. *See Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984).

The issue of the shooting of Toon and Quinn, however, is an entirely different matter. Because the record shows that Lieutenant Zerkle hit Quinn in the course of his justified shooting of Toon, he is entitled to judgment.

As an initial matter, we are all in agreement that the lethal shooting of Toon—who in that moment posed an imminent deadly threat to the officers—was justified. Toon attempted to evade officers by jumping out of his bedroom window, but not before grabbing his AR-15 rifle. As he tumbled out the eight-foot-high window, he fell to the ground and his rifle pointed up towards Corporal Whittington. We therefore agree with the

27

district court that it is beyond dispute that Zerkle was entitled to use deadly force under these circumstances.

Where my colleagues and I depart, however, is on the shooting of Quinn. Quinn and Toon were shot at the same time, in the same place, in the same manner, and with the same purpose. While this formulation is often used to judge the reasonableness of state regulation of expression, it seems useful here in judging the objective reasonableness under the Fourth Amendment of the application of excessive force.

Zerkle shot Quinn when he shot Toon. The body camera footage, audio evidence, and expert testimony all make plain that all shots fired by officers on the scene—including the shots that killed Toon and injured Quinn—were fired within two seconds. It is not reasonable to project intent when the scenario unfolded before the officer in the blink of an eye. The shooting occurred in the same place, as Quinn had slipped out of the window immediately after she saw Toon go through it with his rifle. And all bullets were fired in the same manner, a single burst of fire, for the same purpose: to end the deadly threat posed by the suspect who was pointing his AR-15 towards Whittington. Because the shooting was a single event with a singular time, place, manner, and purpose, it was justifiable.

Zerkle had no time to sort through the obvious threat the situation posed. Suddenly confronted with a suspect dropping from above with a high-powered rifle, Zerkle had to orient, decide, and act within a very compressed timeframe. It is quite unfair for our judicial system to spend months massaging the split-second decision that Zerkle made to protect his life and that of Corporal Whittington.

28

When officers have the luxury of time, they may be held to higher standards. But we cannot require those whom society expects to confront danger on its behalf to make finely parsed distinctions in "tense, uncertain, and rapidly evolving" situations with deadly consequences. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Here, the officers acted instantaneously to protect their lives. It is wrong to second-guess their actions. What law is this that requires those who enforce the law to risk their very lives in the service of it?